**IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| **KAREN MEADOWS** | § | |
| **V.** | § | **No.  5:05CV158** |
| **TEXAR FEDERAL CREDIT UNION** | § | |

## ORDER

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the

Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Defendant's

Motion for Summary Judgment (Docket Entry # 30) and was referred to the Honorable Caroline M.

Craven for the purpose of preparing a report and recommendation.  The Court, having reviewed the

relevant briefing, recommends the motion be **DENIED**.

## I.  BACKGROUND

Karen Meadows ("Meadows" or "Plaintiff") filed this action against Texar Federal Credit

Union ("Texar" or "Defendant") under the Family and Medical Leave Act of 1993 ("FMLA"), 29

U.S.C. § 2691, *et seq.*  Plaintiff contends Defendant interfered with her FMLA leave when it

designated her as a "key employee" under the FMLA shortly after she advised Texar of an alleged

need for FMLA leave, and terminated her employment for voluntary job abandonment when she

failed to return from her FMLA leave upon her release to assume a substantially equivalent position

with the same pay, responsibilities and benefits, and subsequently exhausted all available FMLA

leave under Defendant's FMLA leave policy.

## II. DEFENDANT'S MOTION

Defendant moves for summary judgment on Plaintiff's claims and asserts as follows:

Plaintiff's testimony and Plaintiff's healthcare providers' testimony establish that Plaintiff was not

qualified for FMLA leave because she did not suffer from a "serious health condition" under the statute. To the contrary, while on FMLA leave, Plaintiff was able to perform her normal activities and was actively seeking new employment as part of her "treatment plan." Further, Plaintiff's admitted and inexcusable failure to comply with Defendant's reasonable notice procedures while on FMLA leave and her failure to return to work after the exhaustion of all available FMLA leave resulted in her loss of the protection of the statute. Even if Plaintiff were somehow protected by the FMLA, Defendant did not interfere with her rights because it gave her all of the leave to which she was entitled and had available for her a substantially equivalent position to which to return, although she never returned to work or even inquired into other positions. Finally, any damages by Plaintiff are barred as a matter of law based on Plaintiff's admitted failure to mitigate.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Topalian v. Ehrman,* 954 F.2d 1125 (5th Cir. 1992), *cert. denied,* 506 U.S. 825 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley,* 992 F.2d 540 (5th Cir. 1993).  Once the movant has shown the absence of material fact

issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).  It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings. *Topalian,* 954 F.2d at 1131.  The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm & Casualty Co.,* 927 F.2d 869, 872 (5th Cir. 1991).  If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

## IV. SUMMARY JUDGMENT EVIDENCE

### A.    Defendant's evidence

Defendant submits the following evidence in support of its motion: (1) Declaration of Kelly Mitchell ("Mitchell Decl."); (2) Excerpts and exhibits from Plaintiff's deposition ("Plaintiff's Depo."); (3) Excerpts and exhibits from the deposition of Connie Lee ("Lee Depo."); (4) Excerpts and selected exhibits from the deposition of Dr. Cheryl Clevenger ("Clevenger Depo."); (5) Excerpts and exhibits from the deposition of Betty J. Feir, Ph.D. ("Feir Depo."); (6) Declaration of Connie Lee ("Lee Decl."); (7) Courtesy copy of selected FMLA regulations; and (8) Plaintiff's answers to Defendant's First Set of Interrogatories.

Defendant's evidence establishes the following: Texar Federal Credit Union is a federally-chartered credit union with its home office in Texarkana, Texas, and additional offices located in

New Boston, Atlanta, DeKalb, and Hooks, Texas. It also has an office referred to as Centre West, and an office in Texarkana, Arkansas. (Mitchell Decl. ¶ 3).   Texar maintained, and continues to maintain an employee handbook that includes a comprehensive Family and Medical Leave Act policy to advise employees of their rights and obligations under that statute. Plaintiff acknowledged her receipt of and reference to the handbook. (Plaintiff's Depo. pgs. 30:9-24; 33:8-35:7, and Ex. 1 and 2).

Texar's FMLA policy: (a) provides for a total of 12 weeks of unpaid leave in any forward rolling 12-month period; (b) includes a description of "key employee" status; and (c) includes notification that a key employee may be reinstated to a "substantially equivalent position" as determined by Texar. (Plaintiff's Depo. Ex. 1). Additionally, the handbook includes a 3 day, no-call, no-show termination policy. (Plaintiff's Depo. Ex. 2). Plaintiff began her employment with Texar in 1993 as a Teller. Thereafter, Texar repeatedly promoted her to her last position as Operations Manager of the Texarkana branch. (Plaintiff's Depo. pgs. 25:22-28: 23).

As the Operations Manager at the Texarkana branch, Plaintiff reported to Connie Lee, now the Executive Vice President for Texar, and was responsible for overseeing the daily operations of the building and making sure the office ran smoothly. In December 2004, Lee gave Plaintiff a negative performance review and advised Plaintiff that her work was substandard; shortly thereafter, in early January 2004, Lee placed Plaintiff on a Performance Improvement Plan ("PIP"). Plaintiff understood that if her performance did not improve, she could lose her job. Lee advised Plaintiff that Texar would re-evaluate Plaintiff's performance in 30 days. (Plaintiff's Depo. pgs. 29:2-7; 36:24-37:21; 38:1-10; 39:2-21; 40:7-25; 41:17-23, and Ex. 3 and 4)(Lee Depo. pg. 8:9-10).

In early February 2005 and again on March 25, 2005, Lee met with Plaintiff to review

4

Plaintiff's performance. Lee told Plaintiff that she was not improving to Texar's satisfaction and risked termination of employment if she did not improve. (Plaintiff's Depo. pg. 42:5-22)(Lee Depo. pg. 103:16-22).  On March 29, 2005, just after her last PIP meeting with Lee, Plaintiff placed a note in Lee's work mailbox advising that Plaintiff would be off work under a doctor's care and would not return until April 4, 2005. Plaintiff was depressed, stressed, nervous, and upset because she disagreed with Lee about her PIP.(Lee Depo. pg. 45:3-46:16; Plaintiff's Depo. pgs. 49-50).

Plaintiff visited with Dr. Cheryl Clevenger on March 29, 2005 (Plaintiff's Depo. at pg. 49). Dr. Clevenger referred Plaintiff to Betty J. Feir, Ph.D, a local psychologist. (Plaintiff's Depo. pgs. 49:7-9; 53:12-17). Plaintiff told Dr. Feir Plaintiff was afraid she was about to be fired.  (Feir Depo. pg. 26:14-19).

On April 1, 2005, Jessica Stolee, then the HR Representative for Texar, sent Plaintiff a letter about Plaintiff's vague doctor's note, advised Plaintiff of her "key employee" status under the FMLA and her obligation to keep Texar informed of her status, and requested that Plaintiff complete the required FMLA paperwork. (Plaintiff's Depo. pgs 59:19-60:11, and Ex. 7).  Plaintiff did not return to work on April 4, 2005 despite her representation to the contrary. Instead, on April 5, 2005, Plaintiff delivered a letter to Stolee at the credit union wherein Plaintiff advised Texar of her desire to take FMLA leave and her request for an explanation of her "key employee" status. Ex. B (Plaintiff's Depo. pgs. 64-65, and Ex. 8).

On April 6, 2005, Stolee sent Plaintiff a letter advising Plaintiff: (1) that she did not return to work on April 4, 2005 despite her initial representation to the contrary; (2) that Texar needed to know whether Plaintiff intended to return to work; (3) that Plaintiff was required to communicate her concerns and needs directly to Stolee (not by proxy); (4) of the allocation of her sick or vacation

leave and Texar's doctor's note policy; (5) of her "key employee" status and no guarantee of reinstatement upon cessation of the leave; and (6) that Texar could not afford to have the Operations Manager position vacant. (Plaintiff's Depo. pg. 68:7-69:24, and Ex. 9).

On April 6, 2005, Plaintiff submitted an on-line job application to Bank of the Ozarks. Plaintiff told the prospective employer that she wanted to "try a different type of work in the lending field" and indicated she was "still working." (Plaintiff's Depo. pg. 73:10 to pgs. 74:5; 74:22-24; 77:24 to pg. 78:3, and Ex. 10).  Plaintiff returned a completed Certification of Health Care Provider to Texar on or about April 7, 2005. The paperwork reflected that the approximate date of Plaintiff's FMLA leave would be from March 29, 2005 through April 29, 2005. The form is signed by Dr. Clevenger.  Dr. Clevenger testified the signature on the form is not her signature; there are individuals who fill out forms for Dr. Clevenger; and she did not complete the FMLA Certification of Health Care Provider for Plaintiff.  Dr. Clevenger testified she had no idea who determined the April 29, 2005  return to work date. Dr. Feir admits she did not choose April 29, 2005 as a return to work date for Plaintiff.(Plaintiff's Depo. pg. 78:16 to pg. 79:11, and Ex. 11)(Clevenger Depo. pgs. 30:11-31:8; 32:4-25, and Ex. 3)(Feir Depo. pg. 25:7-12).

On April 12, 2005, Stolee sent Plaintiff a letter advising Plaintiff of: (a) the amount of FMLA leave Plaintiff had left; (b) the substitution of paid leave; (c) Texar's continuation of Plaintiff's health premium payments; (d) COBRA options if Plaintiff could not return to work; (e) the need for a "full, unrestricted return to work certification prior to job restoration, if restoration were feasible; (f) her "key employee" status and the lack of a guarantee of reinstatement due to the grievous, economic harm Texar would suffer leaving Plaintiff's position unfilled; and (g) Texar's requirement that Plaintiff furnish Texar with periodic reports every Friday, beginning on April 15, 2005, of

6

Plaintiff's status and intent to return to work. Ex. B (Plaintiff's Depo. pgs. 81:5-83:14, 20-21, and Ex. 12). In response to Stolee's letter, dated April 12, 2005, Plaintiff sent Stolee a letter on April 14, 2005 as a periodic report of her status and intent to return to work. Plaintiff reported that Dr. Feir continued to "treat" her and she would see Dr. Feir again on April 20. Plaintiff also asked Stolee about her total leave time. (Plaintiff's Depo. pgs. 84:5-85:23; 86:23-87:6, and Ex. 13).

Plaintiff provided her second periodic report on April 21, 2005, wherein she advised Texar that she would continue to stay off work for another week until her next appointment on April 28. She further advised Texar of her desire to return to work on May 3, 2005, and as a result thereof, Lee expected Plaintiff back on May 3. Despite Plaintiff's representation, she did not return to work on May 3, 2005. (Plaintiff's Depo. pgs. 87:7-19; 87:24-89:9, and Ex. 14)(Lee Depo. pg. 108:11-12).

On April 28, 2005, during a visit to Dr. Clevenger, Plaintiff reported she had already seen an attorney who felt she had a case for discrimination. Because of this, Plaintiff wanted to take some extra time off as she was dreading going back to work. Plaintiff implied it would be "counterproductive" for her to go to work when she was planning to sue Texar. Dr. Clevenger testified she "left it up to [Plaintiff] and the work" as to whether Plaintiff needed to be off of work at that time.  As of April 28, 2005, Dr. Clevenger reported that Plaintiff "could have done whatever she wanted probably." (Clevenger Depo. pgs. 36:22-37:12; 39:4-14; 41:5-9; 70:20-71:6, and Ex. 1 [April 28, 2005 notes]). Dr. Clevenger opined that if Plaintiff had a different job, she may not have experienced the stress that served as the reason for Plaintiff's FMLA leave. In her medical opinion, generalized fear regarding a possible termination is not "by itself" a medical reason to keep someone off of work.  (Clevenger Depo. pg. 52:2-4; 63:8-15; 72:8-24).

Plaintiff failed to provide the required periodic report on April 29, 2005. Instead, Plaintiff

7

had Dr. Feir provide Texar with notice that Plaintiff would not return to work, although Dr. Feir provided no indication of when Plaintiff would return. In response, Stolee sent Plaintiff a letter, dated May 2, 2005, asking Plaintiff to advise Texar of her return to work status. Despite Stolee's request for an update, Plaintiff did not provide the requested information.(Plaintiff's Depo. pgs. 89:18-90:17, and Ex. 15)(Lee Depo. pgs. 69:11-15; 110:11-18, and Ex. 8).  Plaintiff did not contact Texar as required. Instead, on May 5, 2005, Dr. Feir sent Texar a letter requesting the amount of Plaintiff's remaining FMLA leave. Dr. Feir also "tentatively" released Plaintiff to return to work on May 12, 2005. (Plaintiff's Depo. pgs. 91:16-23; 92:2-24; 94:18-23, and Ex. 16).

During her FMLA leave, Plaintiff was shopping, taking trips, attending ball games and social functions, traveling with her son to a basketball camp out of town and to an out of town birthday party, watching television, and shuttling her children to and from school and sports practices. (Plaintiff's Depo. pgs. 70:4-71:2; 95:9-15; 96:6-97:4; 97:16-22; 125:5-126:5; 127:19-128:10). Plaintiff could not recall ever having been told by either Dr. Feir or Dr. Clevenger that while she was on FMLA leave she could not work for anyone (Plaintiff's Depo. at pg. 97).

After Plaintiff failed to return to work after several representations that she would, failed to provide the required personal, periodic reports on April 29 and again on May 5, and failed to provide a return to work date, Texar filled her position on May 6, 2005. The announcement for the replacement was made at approximately 8:30 a.m. on that date. Following the announcement, Plaintiff delivered a letter to Texar at approximately 11:30 a.m. claiming she was released to return to work on May 12, 2005. Plaintiff concedes she never provided Texar with an unrestricted release to return to work. (Lee Decl. ¶ 5)(Lee Depo. pg. 105:7-22)(Plaintiff's Depo. pg. 98:15-18, and Ex. 17).

On May 9, 2005, Stolee advised Plaintiff in writing of her remaining days of FMLA leave, reminded her of her key employee status, and advised her that her position had been filled, and as of that date, Texar did not have a position for her. Texar did not terminate Plaintiff on May 9. Plaintiff concedes that nowhere in this letter was she told she was fired; to the contrary, it was simply her personal belief that she was no longer employed. Plaintiff was confused when she received the letter; she did not call Texas to ask questions about the letter. (Plaintiff's Depo. pgs. 98:19-100:10, and Ex. 18). Upon reflection, Plaintiff admitted she was not terminated on May 9, 2005. (Plaintiff's Depo. pg.135:4-12)(Lee Depo. pg. 111:1-5).

As further evidence that Texar did not terminate Plaintiff's employment on May 9, 2005: (a) Texar continued to pay her health insurance benefits; (b) Plaintiff did not complete an exit interview survey; (c) she did not file for unemployment; and (d) she was not asked to retrieve nor sent her personal belongings. Texar did not send Plaintiff a COBRA letter, request her pass key for the building, or pack up her office and mail Plaintiff her personal belongings at any time in May 2005. Further, it continued to pay her health insurance premiums through June 30, 2005.(Plaintiff's Depo. pgs. 100:11-101:6, 13-15)(Lee Depo. pgs. 109:15-110:6; 111:1-112:3; 112:24-113:18; 124:10-13).

On the morning of May 11, 2005, the day before Plaintiff was "tentatively" supposed to return to Texar, Texar opened a position for an Office Manager at its Centre West branch office. The Centre West Office Manager position was nearly identical to Plaintiff's prior Operations Manager position in that both jobs: (1) had equal authority and job responsibilities; (2) involved the management of employees; (3) had the same hours; and (4) were equivalent in Texar's management structure. Additionally, Texar intended to offer Plaintiff this job at the same level of pay and benefits Plaintiff had in her prior position.  (Lee Depo. pgs. 114:18-115:2; 116:10-117:15).  According to Dr.

9

Feir's testimony, Plaintiff would have taken a comparable job.  (Feir Depo. pg. 123:10-17).

Plaintiff did not return to work on May 12  as she advised she would, provide any subsequent, periodic reports as required, or even call Texar to discuss her status. Five days later, on May 17, 2005, Stolee sent her a letter inquiring about her whereabouts to explore other job opportunities.  At this time, the Centre West position remained open.  Plaintiff admits she ignored Stolee's letter, and she concedes that she was unable to return to work on May 17. (Plaintiff's Depo. pgs. 103-105).

Texar never denied Plaintiff the opportunity to assume the available, equivalent position had Plaintiff returned to work on May 12 as expected. (Plaintiff's Depo. pgs. 101:22-102:25; 103:1-105:1, 12-19; 153:20-25, and Ex. 19)(Lee Depo. pgs. 112:12-23; 122:5-24). No doctor told Plaintiff she could not return to work after May 12.(Plaintiff's Depo. pgs. 159:14-19; 105:17-19). When Texar did not hear from Plaintiff in any manner, it filled the Centre West position on May 20, 2005. (Lee Decl. ¶ 7). Plaintiff never contacted Texar thereafter to inquire about other positions. (Plaintiff's Depo. pgs. 150:11-20; 168:6-9). On May 24, 2005, for the first time since the start of her FMLA leave, Plaintiff, through her counsel, demanded reinstatement. (Plaintiff's Depo. Ex. 20).

On June 16, 2005, Stolee sent Plaintiff a letter, in response to the May 24 letter from Plaintiff's attorney, advising her that: (1) as of June 10, Plaintiff had exhausted all available FMLA leave without returning to work or communicating her intentions; (2) she was not terminated in May; (3) reinstatement at this time would cause grievous economic injury to Texar [and included the specific reasons therefore]; and (4) Plaintiff's no-call, no-show following the expiration of her FMLA leave was considered as a voluntary resignation. Plaintiff states she did not make any attempts to come back to any kind of substantially similar job at Texar. (Plaintiff's Depo. pgs.

107:23-108:19; 110:12-111:25, 167:11-24; 168:6-9, and Ex. 21)(Mitchell Decl. ¶ 5).

Plaintiff applied for two or three jobs since her actual termination letter from Texar in June 2005. She did not regularly check the newspapers or internet, even though she had internet access, or register on any internet job sites such as monster.com or hotjobs.com.  She did not join any networking groups or apply for work at the local office of the Texas Workforce Commission.(Plaintiff's Depo. pgs. 23:7-10; 97:12-15; 114:21-116:21). In March 2006, Plaintiff decided to return to school full-time to earn a teaching certificate.  In her application with Citibank, Plaintiff stated she left Texar to work closer to home and "to spend time with [her] kids for summer."  (Plaintiff's Depo. pgs. 116:15-21; 133:15-21, and Ex. 23).

Plaintiff admits Texar informed her a couple of times in letters of her key employee status; she was told she would be denied reinstatement prior to the time when she thought she was terminated.  Plaintiff testified she thought she received all FMLA leave she wanted. (Plaintiff's Depo. pgs. 148:20-149:13; 163:15-25). Plaintiff exhausted all available FMLA leave under Texar's FMLA leave policy on June 10, 2006, and never returned to work. (Lee Decl. ¶ 8).

On August 17, 2005, Plaintiff filed this lawsuit alleging that Texar interfered with her FMLA leave by: (1) filling her position on May 6, 2005; (2) advising Plaintiff, on May 9, 2005, three days before her "tentative" release to return to work, that no position was available; and (3) allegedly failing to restore Plaintiff to the same or an equivalent position when she returned to work, despite the fact she never returned. *See* Plaintiff's Original Complaint at ¶ 17.

B.      **Plaintiff's evidence**

Plaintiff attaches the following evidence to her response:[1] (1) Earnings Record Information from Social Security Administration ("Meadows Ex. A"); (2) Employee Evaluations of Karen Meadows dated December 10, 1999; December 11, 2000; November 28, 2001; December 1, 2002; December 1, 2003; and December 1, 2004 (Meadows Exhibits B-1 through B-6); (3) Job improvement documents dated December 23, 2004, and February 14, 2005 (Meadows Exhibits C-1 through C-2); (4) Affidavit of Plaintiff, Karen Meadows ("Meadows Affidavit" or "Meadows Ex. D"); (5) Medical Excuses and Certification by Health Care Provider (Meadows Exhibits E-1 through E-3); (6) Correspondence (Exhibit F-1 – Note from Karen Meadows to Connie Lee of March 29, 2005)(Exhibit F-2 – Letter from Jessica Stolee to Karen Meadows dated April 1, 2005)(Exhibit F-3 – Letter from Karen Meadows to Jessica Stolee dated April 5, 2005)(Exhibit F-4 – Letter from Jessica Stolee to Karen Meadows dated April 6, 2005)(Exhibit F-5 – Letter from Jessica Stolee to Karen Meadows dated April 12, 2005)(Exhibit F-6 – Letter from Karen Meadows to Jessica Stolee dated April 14, 2005)(Exhibit F-7 – Letter from Karen Meadows to Jessica Stolee dated April 21, 2005)(Exhibit F-8 – Letter from Jessica Stolee to Karen Meadows dated May 2, 2005)(Exhibit F-9 – Memo dated May 5, 2005, by Jessica Stolee)(Exhibit F-10 – Letter from Karen Meadows to Jessica Stolee dated May 6, 2005)(Exhibit F-11 – Letter from Jessica Stolee to Karen Meadows dated May 6, 2005)(Exhibit F-12 – Letter from Jessica Stolee to Karen Meadows dated May 9, 2005)(Exhibit F-13 – E-mail from Jessica Stolee to Marshall Wood dated May 10, 2005)(Exhibit F-14 – Letter from Jessica Stolee to Karen Meadows dated May 17, 2005)(Exhibit F-15 – Letter from Ned A.

---

[1] In its reply, Defendant objects to Plaintiff's response, asserting it does not contain as "Statement of Genuine Issues" and it is 4 pages over the page limit allowed in the Local Rules. The Court is not inclined to disregard the final 4 pages of Plaintiff's response.

Stewart, Jr., to Texar Federal Credit Union dated May 24, 2005)(Exhibit F-16 – Letter from Marshall Wood to Ned A. Stewart, Jr., dated June 2, 2005)(Exhibit F-17 – Letter from Jessie Stolee to Karen Meadows dated June 16, 2005); (7) Records of Dr. Betty J. Feir ("Exhibit G"); (8) Record of Dr. Cheryl Clevenger dated April 28, 2005 ("Meadows Ex. H"); (9) Defendant's Objections and Answers to Plaintiff's First Set of Interrogatories, ("Meadows Ex. I"); (10) Excerpts from deposition of Karen Meadows taken on May 10, 2006 ("Meadows Ex. J"); (11) Excerpts from deposition of Betty Feir, Ph.D., taken on October 27, 2006 ("Meadows Ex. K"); (12) Excerpts from deposition of Dr. Cheryl Clevenger taken on June 28, 2006 ("Meadows Ex. L"); and (13) Excerpts from deposition of Connie Lee taken on May 11, 2006 ("Meadows Ex. M").

Plaintiff's evidence establishes the following: Texar admits that both Plaintiff and Texar are covered by the FMLA. (*See* Defendant's First Amended Original Answer filed in this action on June 22, 2006, paragraph XVI).  Plaintiff was initially employed by Texar in 1993 as a Teller at $5.15 per hour. Later in 1993, Plaintiff was promoted to the position of Loan Processor. After working as a Loan Processor over a year, Plaintiff was promoted to the position of Loan Officer. After working as a Loan Officer over four years, Plaintiff was promoted to the position of Teller Supervisor. After working as Teller Supervisor for approximately one year, Plaintiff was promoted to the position of Loan Underwriter. After working as Loan Underwriter for over a year, Plaintiff was promoted to the position of Loan Department Supervisor. After working as Loan Department Supervisor, Plaintiff was promoted to the position of Operations Manager of Texar's main office in Texarkana, a position she held approximately four years until she was terminated by Texar in 2005. At the time Plaintiff was terminated by Texar, she had worked for Texar for twelve years. (Meadows Ex. J, pgs. 25-28).

As Operations Manager of Texar's main office in Texarkana, Plaintiff's job was to make sure

the office operated smoothly. In this position, Plaintiff supervised between 29 and 33 employees. Plaintiff felt her job was her life (Meadows Ex. G).  At the time of her termination, Plaintiff's salary with Texar was $54,075.63 per annum. (Meadows Ex. A).  Up until late 2004, Plaintiff had been a good employee of Texar and had always received good evaluations by Texar for her work. (Meadows Ex. K, pgs. 26-27).  Plaintiff attached copies of her job evaluations dated December 10, 1999; December 11, 2000; November 28, 2001; December 1, 2002; and December 1, 2003. On all of these evaluations and in virtually every category of each, Plaintiff scored well above average in her job performance. The 2002 and 2003 evaluations were both signed by Plaintiff's then supervisor, Connie Lee ("Lee").

In late 2004, Plaintiff suddenly began to encounter intense criticism of her job performance by her supervisor, Connie Lee, and Jessica Stolee ("Stolee"), Texar's then Human Resource Manager. On December 1, 2004, Plaintiff received a  negative job evaluation from Lee. (Meadows Ex. B-6). On December 23, 2004, Lee and Stolee placed Plaintiff under a Performance Improvement Plan as a follow-up to the December 1 negative job evaluation. (Meadows Ex. C-1). Plaintiff met with Lee and Stolee regarding the Performance Improvement Plan and was told her job performance was not what was expected of her and she could be fired if she did not start performing up to expectations. (Meadows Ex. J, pgs. 39-40).

On February 14, 2005, Lee and Stolee issued Plaintiff a written warning captioned "Corrective Action" that she was not meeting the requirements of her Performance Improvement Plan. (Meadows Ex. C-2). On March 25, 2005, Plaintiff again met with Lee and Stolee, was told her job performance was not improving, and was advised she would be continued under the Corrective Action process. Plaintiff felt the above criticisms of her job performance by Lee and Stolee were

unjustified. (Meadows Ex. J, pg. 50). Plaintiff believed she was complying with the requirements

of the Performance Improvement Plan. (Meadows Ex. J, pg. 41). As a result of these criticisms,

Plaintiff became very stressed out. (Meadows Ex. J, pg. 41).

In 2000, Plaintiff was sexually harassed by a Director of Texar who called her on the

telephone, made sexually explicit, highly objectionable remarks to her, and made it clear he was

interested in having sexual relations with her. Plaintiff is married and has two children and was

greatly offended by this incident. Plaintiff reported the incident to Kelly Mitchell ("Mitchell"),

President of Texar, who is a close friend of the Director in question. Mitchell did nothing in response

to Plaintiff's report. Thereafter, for the next four years, whenever the Director in question would

come into the credit union, Mitchell would remark "there is your boyfriend" or words to this effect.

Mitchell would make such remarks to Plaintiff in the presence of other employees. Whenever

Mitchell would make such remarks, Plaintiff would complain to him about such remarks and ask him

to refrain from making such remarks in the future. (Meadows Ex. D). Plaintiff believed the criticism

of her job performance by Lee and Stolee commencing in late 2004 was in retaliation for the above

described sexual harassment incident and the report and complaints she made to Mitchell on account

of the incident. (Meadows Ex. J, pgs. 44, 47-50). Plaintiff believed somebody at Texar was out to

get her. (Meadows Ex. J, pg. 44).

By the end of March 2005, Plaintiff had become depressed, stressed out, nervous, and upset

about her job situation. (Meadows Ex. J, pg. 49). On March 29, 2005, Plaintiff was so nervous and

upset that she decided to see a doctor. On that date, she went to see Dr. Cheryl Clevenger, a general

practitioner. (Meadows Ex. J, pg. 49). When Dr. Clevenger saw Plaintiff on March 29, 2005, Dr.

Clevenger states Plaintiff was very depressed, very anxious, and could not sleep, all due to issues

at work. (Meadows Ex. L, pgs. 19-20). Dr. Clevenger further states Plaintiff was having a hard time. (Meadows Ex. L, pg. 21). Dr. Clevenger put Plaintiff on Lexipro, an antidepressant, anti-anxiety medication, and decided to refer Plaintiff to Dr. Betty Feir ("Feir"), a clinical psychologist. (Meadows Ex. L, pgs. 20, 22). Being of the opinion Plaintiff needed some time off from work, Dr. Clevenger signed a medical excuse stating Plaintiff should not return to work until April 4, 2005. (Meadows Ex. L, pg. 27; Meadows Ex. E-1).  Plaintiff informed Connie Lee, her supervisor, she was under a doctor's care and would be off work until April 4, 2005, in a written note left for Ms. Lee at Texar. (Meadows Ex. F-1).

On April 1, 2005, Stolee wrote Plaintiff a letter stating Stolee had received Dr. Clevenger's medical excuse but noting that the excuse did not provide any specific information about Plaintiff's illness. Stolee further stated "[a]lthough we consider you to be a possible 'key employee,' as defined by the FMLA, we still need information concerning your absence in order to ascertain any potential application of the Family Medical Leave Act (FMLA)." Enclosed in the letter was an FMLA approved "Certificate of Health Care Provider" which Plaintiff was to have completed by her doctor and sent in to Texar. (Meadows Ex. F-2).

On April 4, 2005, Plaintiff saw Dr. Feir for the first time. Dr. Feir's assessment of Plaintiff was "[s]ignificant depression secondary to job stress." Dr. Feir's diagnosis of Plaintiff was MDD, major depressive disorder. (Meadows Ex. G). On April 5, 2005, Plaintiff wrote Stolee a letter informing Stolee she had seen both Dr. Clevenger and Dr. Feir and Dr. Feir had suggested she take FMLA leave. Plaintiff further stated in the letter, "I noticed in your letter to me [of April 1, 2005] that I am a possible 'key employee.'" I would like to know if I am or am not a 'key employee' and how/if this fits into the FMLA plan." (Meadows Ex. F-3).

On April 6, 2005, Stolee wrote Plaintiff a letter confirming a conversation they had on March 31, 2005, in which Stolee agreed Plaintiff need not report to work on April 4, 2005 until after Plaintiff's doctor's appointment that day. Stolee also confirmed receipt of Plaintiff's letter to her of April 5, 2005, but again noting that no details of Plaintiff's illness had yet been provided. Stolee stated she was awaiting receipt of the Health Care Provider Certificate she had sent to Plaintiff on April 1, 2005. Stolee then states in the letter, "[w]e have determined you are considered a 'key employee' and assuming FMLA applies we cannot guarantee your employment will be reinstated. Your position will be filled in your absence as the Credit Union cannot afford not [sic] to have the Branch Operations Manager position vacant." (Meadows Ex. F-4). At this point in time, Plaintiff did not know how long she would have to be off work. (Meadows Ex. J, pg. 65).

Also on April 6, 2005, Plaintiff completed and submitted a job application to Bank of the Ozarks in Texarkana, Texas.  Plaintiff thought she was about to be fired by Texar (Meadows Ex. G).. When Plaintiff communicated this to Dr. Feir, it was Dr. Feir who recommended that she apply for a job elsewhere. Bank of the Ozarks was not yet open for business when Plaintiff submitted her job application. Dr. Feir felt Plaintiff, for her own good, should be looking for a new job. (Meadows Ex. K, pgs. 35, 120).

On April 7, 2005, Dr. Clevenger's clinic, Collom & Carney Clinic, submitted to Texar the FMLA approved Certificate of Health Care Provider form sent to Plaintiff by Stolee on April 1, 2005. In this Certificate, Plaintiff's medical condition is stated as "[s]ignificant depression secondary to job stress," and the probable duration of Plaintiff's job incapacity is stated as "3/29/05 thru 4/29/05." (Meadows Ex. E-2). On April 12, 2005, Stolee wrote Plaintiff a letter informing Plaintiff Texar had granted her request for FMLA leave. The letter further stated:

17

4.  You will be required to provide a full, unrestricted return to work certification prior to be restored to employment, if such restoration is feasible. If such certification is not received, your return to work will be delayed until certification is provided.

5. As a follow up from our discussion on April 7, 2005, when you notified us of your intent to take FMLA, we do consider you a 'key employee' as described in 825.218 of the FMLA regulations. Leaving your position unfilled for the duration of your absence could cause substantial and grievous economic harm to us. As such, we cannot [sic] guarantee reinstatement to your same or similar position.

6. While on leave, you will be required to furnish us with periodic reports every Friday, beginning on 4/15/05, of your status and intent to return to work. If the circumstances of your leave change and you are able to return to work earlier than the date indicated on your request for FMLA leave, you will be required to notify us at least two working days prior to the date you intend to report to work.

7. If you are reinstated to employment following your FMLA leave, we remind you that you are still subject to any ongoing performance management process.

(Meadows Ex. F-5).

Beginning on April 4, 2005, Plaintiff saw Dr. Feir on a weekly basis. (Meadows Ex. J, pg. 67). In her written reports on Plaintiff dated April 4, 2005, April 11, 2005, April 20, 2005, April 28, 2005, and May 5, 2005, Dr. Feir remained constant in her diagnosis of Plaintiff, MDD or major depressive disorder. (Meadows Ex. G). Dr. Feir is of the opinion that when a person, like Plaintiff, is under stress, there are a number of ways of treating the stress, namely having the individual do things that she enjoys and having the individual participate in activities that bring pleasure or help the individual's self-esteem. In this connection, Dr. Feir recommended to Plaintiff as part of her treatment that she be with her children and go to her children's ball games and birthday parties; that she go with her husband to social affairs; that she socialize with her girlfriends; that she go out of town; and that she go shopping. Dr Feir was also of the opinion that these same things would be helpful for Plaintiff's depression in that they would encourage Plaintiff to pull herself out of

withdrawal based on depression. On Dr. Feir's recommendation, Plaintiff did some of these things but not as many as Dr. Feir would have liked.  (Meadows Ex. K, pgs. 36-39, 84). Dr. Feir did not find Plaintiff to be a malingerer. (Meadows Ex. K, pgs. 44, 91).

Plaintiff furnished Texar with periodic reports on or before every Friday, beginning on April 15, 2005, of her status and her intent to return to work. On April 14, 2005, Plaintiff sent such a written report to Stolee. (Meadows Ex. F-6). And, on April 21, 2005, Plaintiff sent such a written report to Stolee. In this report, Plaintiff did not state any date she would return to work. She did, however, state she "would like to return to work on Tuesday, May 3, 2005," and she planned to visit with [her] doctor about this . . . on April 28, 2005." (Meadows Ex. F-7).

On April 28, 2005, Plaintiff again saw Dr. Clevenger. Plaintiff told Dr. Clevenger on this occasion she was still stressed out and wanted to stay off work longer. Dr. Clevenger did recommend that Plaintiff stay off work until further notice, but she states in this regard she would not have made this recommendation unless she thought it might help Plaintiff mentally (Meadows Ex. L, pgs. 39-40)(Meadows Ex. H). Clevenger further commented on Plaintiff' health condition:

> Q: On this visit on April 28th, did you see any medical reason why she couldn't go back to work?
>
> A:  I think mental health is a medical reason. She was having stress and that I have taken people off work for stress, anxiety and depression before.

(Meadows Ex. L, pg. 41).

> Q: So as of the – almost three weeks later when you see Mrs. Meadows on April 28th, did you believe she could not work at that time based on your observations, your visit?
>
> A: I'm not sure that she – I would say she could not work.  I didn't feel it was in her best interest mentally.

(Meadows Ex. L, pg. 50).

Q: Did you have any – any indication, Doctor, that Mrs. Meadows was simply taking time off because she didn't like her job and wanted to find something else?

A: No.

* * *

Q: You didn't have that thought one way or the other, that she did or didn't?

A: I don't recall that thought, that she was trying to take time off for her to find another job . . . .  I didn't get the feeling that she was taking time off from work just to look for a new job.

(Meadows Ex. L, pg. 53).

Dr. Clevenger, like Dr. Feir, does not recall believing Plaintiff was a malingerer not wanting to go back to work. (Meadows Ex. L, pg. 43).   Plaintiff also saw Dr. Feir on April 28, 2005. (Meadows Ex. G).

On April 29, 2005, in lieu of sending a report to Texar herself, Plaintiff had Dr. Feir fax a report on Plaintiff to Stolee. Dr. Feir stated in her report "[Plaintiff] appears unable to cope with the current situation on her job at this time, and it is recommended that she not return to work until her symptoms and coping ability improve." (Meadows Ex. E-3). In a letter to Plaintiff dated May 2, 2005, Stolee acknowledged receiving Dr. Feir's report on April 29, 2005. (Meadows Ex. F-8) Plaintiff asserts neither Texar's FMLA policy nor Stolee's letter to Plaintiff of April 12, 2005 specifically prohibited the furnishing of periodic reports by proxy. Stolee made no complaint on this account in her letter to Plaintiff of May 2, 2005. (Meadows Ex. F-8).

On May 5, 2005, Dr. Feir concluded to release Plaintiff to return to work on May 12, 2005. Dr. Feir stated in this connection in her report dated May 5, 2005:

Karen is showing signs of improvement, and seems to be coping somewhat better.

> Not knowing how many days of FMLA time she has left, she is tentatively released
> to return to work on May 12, 2005, and hopefully she will still be in good standing
> with her job. It is projected that by next week Karen will show even more progress.
> If any further information is needed, please contact me.

(Meadows Ex. G).  Dr. Feir used the word "tentatively" to mean Plaintiff would be released to return

to work on May 12, 2005 if nothing happened to Plaintiff between May 5, 2005, and May 12, 2005,

to dictate otherwise. (Meadows Ex. K, pg. 55).  Dr. Feir further testified she was releasing Plaintiff

to work on May 12 but acknowledging if something happened, like a car accident or a death in the

family, Plaintiff might not be able to go back to work on May 12 even though Dr. Feir had released

her to return to work.  (Meadows Ex. K, pgs. 55-56).

Dr. Feir called Stolee on May 5, 2005, and advised her of Plaintiff's May 12, 2005, return

to work date. Stolee understood this May 12, 2005 return to work date was an unqualified,

unrestricted date. In a memo dated May 5, 2005, Stolee stated on this point:

> Dr. Feir called today regarding Karen Meadows FMLA time remaining again . . . I
> asked her what I could help her with and she indicated she was planning on releasing
> Karen to return to work on May 12, 2005.

(Meadows Ex. F-9).

In her telephone conversation with Stolee on May 5, 2005, Dr. Feir inquired of Stolee how

much time Plaintiff had left on her FMLA leave. (Meadows Exs. F-9, G).  Plaintiff asked Dr. Feir

to obtain this information because she was fearful of overstaying her FMLA leave. Also, if Plaintiff's

FMLA leave was about to expire on May 11, 2005, Dr. Feir felt she could push up Plaintiff's return

to work date one day to May 11, 2005. (Meadows Ex. K, pg. 57).  Stolee refused to give this

information to Dr. Feir. (Meadows Exs. F-9, G).

Dr. Feir was of the opinion Plaintiff was able and willing to go back to work with Texar on

21

May 12, 2005, and, if necessary due to FMLA leave expiration, on May 11, 2005. Conversely, Dr. Feir was of the opinion Plaintiff was not able to go back to work with Texar prior to May 11, 2005. (Meadows Ex. K, pg. 58). Dr. Feir was also of the opinion Plaintiff probably could have gone back to work in another job with a different supervisor and without the stress of her present job in April of 2005. (Meadows Ex. K, pg. 59).

Plaintiff acknowledges she was physically and mentally able to return to work on May 12, 2005, and stated this in a letter to Stolee dated May 6, 2005. (Plaintiff Ex. J, pg. 126; Plaintiff Ex. F-10).  Also on May 6, 2005, Stolee wrote Plaintiff a letter stating "[a]s of Thursday, May 5, 2005, you still have not contacted us. We must hear from you regarding your status immediately." Although Plaintiff herself had not contacted Stolee as of May 5, 2005, Stolee knew Plaintiff's status as of May 5, 2005, based on Dr. Feir's telephone call to Stolee on that date. Stolee then went on to state in this letter:

> As previously stated in our earlier correspondence, we consider you to be a 'key employee.' Based upon this 'key employee' status, we will be moving forward in filling your position. We will not be able to guarantee a position for you if, or when, you return to work. We are unable to continue to run our business effectively without someone actively filling the role of Operations Manager.

(Meadows F-11).

On May 9, 2005, Stolee wrote Plaintiff a letter summarizing the communications had by and between Stolee, Plaintiff, and Dr. Feir since Plaintiff' FMLA leave had commenced. Plaintiff asserts this summary included several errors and untruths such as:

> In your April 21, 2005 letter you informed us you would be returning May 3, 2005.

> In her April 21, 2005 letter, Plaintiff stated she 'would like to return to work on Tuesday, May 3, 2005,' and she planned 'to visit with [her] doctor about this . . . on April 28, 2005.'

We did not hear from you May 3, 2005, May 4, 2005, or May 5, 2005.

On May 5, 2005, Dr. Feir telephoned Stolee to advise of Plaintiff May 12, 2005, return-to-work date, and Stolee acknowledged receiving this call in her internal memorandum dated May 5, 2005.

In the third paragraph of the letter, Stolee refers to Dr. Feir's correspondence of April 5, 2005, and Plaintiff' correspondence of April 6, 2005.   Plaintiff asserts there is no such correspondence.  In the fourth paragraph of this letter, Stolee stated:

> As previously stated in our earlier correspondence, we consider you to be a 'key employee.' Based upon this 'key employee' status, we have filled your position as of Friday May 6, 2005 at 8:30 am. We did not receive your letter with your intent to return to work until May 6, 2005 at 11:30 am. At this time we do not have a position available for you to return to.

(Meadows Ex. F-12).

Plaintiff interpreted this to mean she was terminated in Texar's employ as of May 6, 2005. (Meadows Ex. J, pg. 100).  Plaintiff was confused by Stolee's May 9 letter. (Plaintiff Ex. J, pg. 99). First of all, although Stolee's letter to her dated May 6, 2005 indicated her position at Texar would be filled by someone else in the future, it did not indicate her position had already been filled the morning of May 6, 2005. (Meadows Ex. F-11). Second, her letter to Stolee dated May 6, 2005, stating she would be returning to work on May 12, 2005, was received by Stolee on May 6, 2005, a Friday, the day of the week when her weekly report was due. (Meadows Ex. F-10). Third, based on Dr. Feir's telephone call to Stolee on May 5, 2005, Stolee knew on May 5, 2005 that Plaintiff had been released to return to work on May 12, 2005. (Meadows Ex. F-9).

Between the time Plaintiff received Stolee's letter of May 9, 2005, and May 19, 2005, Plaintiff heard nothing further from Texar.  On May 10, 2005, Stolee e-mailed Texar's then counsel, Marshall Wood, stating she had just learned at an FMLA seminar she had attended that, in order for

23

an employer to designate an employee on FMLA leave as a "key employee" and thereby avoid the necessity to reinstate the employee in the employer's employ at the end of the employee's FMLA leave if reinstatement would cause the employer substantial and grievous economic injury, the injury must result from restoration of the employee, not because of the employee's continued absence. (Plaintiff Ex. F-13). *See also* 29 C.F.R. §825.218(a).  According to Plaintiff, up to this point, Texar had taken the legally erroneous position and had so advised Plaintiff that its substantial and grievous economic injury resulted from Plaintiff's absence from work. (Meadows Exs. F-4, F-5, and F-11).

On May 17, 2005, Stolee wrote Plaintiff a letter in which she indicated Plaintiff was still employed by Texar and Plaintiff should contact Texar "to explore other possible positions for you." (Meadows Ex. F-14). Plaintiff asserts this letter was prompted by Stolee's realization on May 10, 2005 that Texar could not designate Plaintiff as a "key employee" because of Texar's failure to comply with 29 C.F.R. §825.218(a) and that Texar's termination of Plaintiff on May 6, 2005, was in violation of the FMLA. Plaintiff asserts the purpose of this letter could only be damage control to attempt to overcome Texar's unlawful termination of Plaintiff on May 6, 2005, by stating that Texar was willing to offer Plaintiff other employment at Texar. On April 12, 2005, Stolee had advised Plaintiff that as a "key employee" Texas could not guarantee reinstatement to either her "same or (a) similar position." (Meadows Ex. F-5).

The May 17, 2005 letter states Texar "asked [in the letter of May 9, 2005] that you contact us to explore other possible positions for you." No such thing was stated in the May 9, 2005 letter. (Plaintiff Ex. F-12).  Plaintiff asserts Stolee's letter to Plaintiff of May 17, 2005, is undermined by the fact that as of May 17, 2005, Texar had no vacant equivalent employment to offer Plaintiff. (Meadows Ex. I).  There was a new Operations Manager position that opened up on May 11, 2005,

24

the so-called Centre West or Call Center position, but this position involved the supervision of only nine employees. (Meadows Ex. I). As Operations Manager of Texar's Texarkana main office, Plaintiff supervised over three times this many employees.  Plaintiff asserts the Centre West/Call Center position was not equivalent to Plaintiff' pre-FMLA leave position in terms of duties and responsibilities. Further, Texar filled this position with someone else on May 20, 2005. (Meadows Ex. I). Plaintiff did not receive Stolee's letter of May 17, 2005, until May 19, 2005. (Meadows Ex. F-14). According to Plaintiff, if Stolee had the Centre West/Call Center position in mind for Plaintiff, it is most difficult to understand why she filled this position with someone else after allowing Plaintiff only perhaps half a day to learn about and accept the position.

Plaintiff employed counsel to represent her between the time she received Stolee's letter of May 9, 2005, and May 19, 2005. (Meadows Ex. D). On May 24, 2005, Plaintiff's counsel wrote Stolee a letter demanding that Plaintiff be reinstated to her pre-FMLA leave position as Operations Manager of Texar's Texarkana main office. (Meadows Ex. F-15). During the same week the letter of May 24, 2005 was written, Plaintiff's counsel was contacted by telephone by Marshall C. Wood and advised that Mr. Wood would be representing Texar in the matter. The telephone call was immediately followed by a letter from Mr. Wood dated June 2, 2005, in which Mr. Wood set forth Texar's position in the matter, namely that Plaintiff failed to make timely periodic reports to Texar while she was on FMLA leave and that Plaintiff had been designated as a "key employee" by Texar and was not guaranteed reinstatement by Texar "to the same or similar position." (Meadows Ex. F-16). The June 2 letter from Mr. Wood said nothing about Stolee's letter to Plaintiff dated May 17, 2005, or the position Stolee took in the letter that Plaintiff was eligible to be employed by Texar in another position.

25

On June 16, 2005, Stolee wrote Plaintiff a letter in which Stolee summarized her interpretation of what had happened in the case thus far and concluded by stating "we now consider you to have voluntarily resigned your position as an employee of Texar Federal Credit Union." (Meadows Ex. F-17). Stolee stated, notwithstanding her classification of Plaintiff as a key employee, that Plaintiff was nevertheless entitled to be reinstated by Texar at least in a "similar" position.

Subsequent to May 9, 2005, when Plaintiff learned she had been terminated in the employ of Texar effective May 6, 2005, Plaintiff applied for employment at the following places: Century Bank, Texarkana, Texas; City of Texarkana, Texas; Ashley Furniture Homestore, Texarkana, Texas; Sims Independent School District, Sims, Texas; New Boston Independent School District, New Boston, Texas; and Pilgrims Pride, Pittsburg, Texas. On April 6, 2005, fearing she was about to be terminated in the employ of Texar, Plaintiff applied for employment with Bank of the Ozarks, Texarkana, Texas. Apart from some employment on a day-to-day basis as a substitute teacher with the Sims and New Boston School Districts, Plaintiff was offered no employment at any of the above places. (Meadows Ex. D). Out of all the above job applications, she was able to obtain only two job interviews, Bank of the Ozarks and Ashley Furniture Homestore. (Meadows Ex. J, pg. 119). After the subject lawsuit was filed, every time Plaintiff would submit a job application to a prospective employer, defense counsel would subpoena such application from the prospective employer. Plaintiff viewed the issuance of these subpoenas as hindering her ability to get a job and discouraged her from making job applications. (Meadows Ex. D).

In early May of 2006, Plaintiff applied for employment at Traditions Bridal & Formal, Texarkana, Texas. The owner of this business advised Plaintiff that although she was not in a position to employ Plaintiff at that particular time, she would like to employ Plaintiff and thought

she would be in a position to employ Plaintiff in the near future. Plaintiff wanted the job and decided

to cease looking for employment at the time so as to avoid accepting any employment she would

have to soon give up should the job offer from Traditions Bridal & Formal materialize as Plaintiff

believed it would. On June 13, 2006, the job offer from Traditions Bridal & Formal did materialize.

Plaintiff accepted the employment offer and has been so employed up to the present date. (Meadows

Ex. D).

Plaintiff was replaced on May 6, 2005 as Operations Manager of Texar's main office in

Texarkana by another employee of Texar, Randelle Snyder. (Meadows Ex. M, pg. 34).  Prior to

2005, Plaintiff had taken FMLA leave to have surgery from August 15, 2004, to August 30, 2004.

During this 2004 FMLA leave, Plaintiff had been temporarily replaced as Operations Manager of

Texar's main office in Texarkana by Randelle Snyder. (Meadows Ex. I).  Ms. Snyder, and others,

had temporarily replaced Plaintiff before when Plaintiff had been absent from work. (Meadows Ex.

M, pg. 35)(Def.'s Interrogatory Answer No. 6). When Plaintiff returned to work, Ms. Snyder

returned to her regular job as a Loan Officer with Texar. (Meadows Ex. M, pg. 36). Even when Ms.

Snyder was required to perform the duties of her regular job during the times she served as Plaintiff's

temporary replacement, Ms. Snyder's temporary replacement of Plaintiff during Plaintiff's absences

created no problems for Texar. (Meadows Ex. M, pg. 40).

## V.  APPLICABLE LAW

The Family Medical Leave Act ("FMLA"), enacted in 1993, is intended to "balance the

demands of the workplace with the needs of families" and "entitle employees to take reasonable

leave for medical reasons." 29 U.S.C. §§ 2601(b)(1) and (2).   The FMLA guarantees the substantive

rights of up to twelve weeks of unpaid leave for eligible employees of covered employers for serious

health conditions and reinstatement to the former position or an equivalent one upon return from that leave.  26 U.S.C. §§ 2612(a)(1), 2614(a). The Act creates a private right of action to seek equitable relief and money damages against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights.  29 U.S.C. §§ 2615(a)(1), 2617(a); *see Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 724-25 (2003). Section 2615(a) creates two types of claims: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir.2001)(internal citations omitted).

Under the FMLA, an employee is entitled to leave for: (1) the birth of a child; (2) the adoption of a child; (3) to care for certain family members who have a serious health condition; or (4) if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612. A "serious health condition" is an illness, injury, impairment, or physical or mental condition that involves inpatient care in a hospital, or continuing treatment by a healthcare provider. 29 U.S.C. § 2611.

The implementing regulations for the FMLA provide further guidance on what constitutes a serious health condition that requires continuing treatment: (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition:

* * *

(2) Continuing treatment by a health care provider. A serious health condition

28

involving continuing treatment by a health care provider includes any one or more
of the following:

> (I) a period of *incapacity* (i.e., inability to work, attend school or
> perform other regular daily activities due to the serious health
> condition, treatment therefore, or recovery therefrom). . . .

29 C.F.R. § 825.114 (emphasis in original).

Mental illness resulting from stress or allergies may be serious health conditions if all the

conditions of Section 825.114 are met. 29 C.F.R. 825.114(d). "Common to each of the definitions

under the regulations is the requirement of incapacity, that is, the inability to work.

The implementing regulations for the FMLA define "health care provider" as:

(1) A doctor of medicine or osteopathy who is authorized to practice medicine or
surgery (as appropriate) by the State in which the doctor practices; or

(2) Any other person determined by the Secretary to be capable of providing health
care services.

(b) Others 'capable of providing health care services' include only:

> (1) Podiatrists, dentists, clinical psychologists, optometrists, and
> chiropractors (limited to treatment consisting of manual manipulation
> of the spine to correct a subluxation as demonstrated by X-ray to
> exist) authorized to practice in the State and performing within the
> scope of their practice as defined under State law. . . .

29 C.F.R. § 825.118(a).  The regulations also set forth an employee's rights on return to work from

FMLA leave:

> (a) On return from FMLA leave, an employee is entitled to be returned to the same
> position the employee held when leave commenced, or to an equivalent position with
> equivalent benefits, pay, and other terms and conditions of employment. An
> employee is entitled to such reinstatement even if the employee has been replaced or
> his or her position has been restructured to accommodate the employee's absence. .
> . .

29 C.F.R. §825.214(a).

The regulations define "equivalent position" as follows:

(a) An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits, and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. §825.215(a).

"When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." 29 C.F.R. § 825.303(a). Where the employee is required to furnish notice to his employer:

[t]he employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (*e.g.,* spouse, adult family member or other responsible party) if the employee is unable to do so personally. . . .

29 C.F.R. §825.303(b).

An employer may require an employee on FMLA leave to report periodically on the employee's status and intent to return to work. 29 C.F.R. § 825.309(a). The employer's policy regarding such reports may not be discriminatory and must take into account all of the relevant facts and circumstances related to the individual employee's leave situation. *Id.* The regulations acknowledge it may be necessary for an employee to take more leave than originally anticipated. 29 C.F.R. § 825.309(c).

The FMLA exempts certain employees, so-called "key employees," from the job restoration

provisions of 29 U.S.C. § 2614(a)(1) and 29 C.F.R. § 825.214(a). Specifically, 29 U.S.C. § 2614(b)

provides:

> (b) Exemption concerning certain highly compensated employees
>
> (1) Denial of restoration
>
> An employer may deny restoration under subsection (a) of this section to any eligible employee described in paragraph (2) if—
>
> (A) such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer;
>
> (B) the employer notifies the employee of the intent of the employer to deny restoration on such basis at the time the employer determines that such injury would occur; and
>
> (C) in any case in which the leave has commenced, the employee elects not to return to employment after receiving such notice.
>
> (2) Affected employees
>
> An eligible employee described in paragraph (1) is a salaried eligible employee who is among the highest paid 10 percent of the employees employed by the employer within 75 miles of the facility at which the employee is employed.

29 U.S.C. § 2614(b) .

> The regulations defines "substantial and grievous economic injury" as follows:
>
> (a) In order to deny restoration to a key employee, an employer must determine that the restoration of the employee to employment will cause 'substantial and grievous economic injury' to the operations of the employer, not whether the absence of the employee will cause such substantial and grievous injury.
>
> (b) An employer may take into account its ability to replace on a temporary basis (or temporarily do without) the employee on FMLA leave. If permanent replacement is unavoidable, the cost of then reinstating the employee can be considered in evaluating whether substantial and grievous economic injury will occur from restoration; in other words, the effect on the operations of the company of reinstating the employee in an equivalent position.

> (c) A precise test cannot be set for the level of hardship or injury to the employer which must be sustained. If the reinstatement of a 'key employee' threatens the economic viability of the firm, that would constitute 'substantial and grievous economic injury.' A lesser injury which causes substantial, long-term economic injury would also be sufficient. Minor inconveniences and costs that the employer would experience in the normal course of doing business would certainly not constitute 'substantial and grievous economic injury.'

29 C.F.R. §825.218.

If an employee meets the definition of key employee, the regulations accord the employee

certain rights:

> (a) An employer who believes that reinstatement may be denied to a key employee, must give written notice to the employee at the time the employee gives notice of the need for FMLA leave (or when FMLA leave commences, if earlier) that he or she qualifies as a key employee. At the same time, the employer must also fully inform the employee of the potential consequences with respect to reinstatement and maintenance of health benefits if the employer should determine that substantial and grievous economic injury to the employer's operations will result if the employee is reinstated from FMLA leave. If such notice cannot be given immediately because of the need to determine whether the employee is a key employee, it shall be given as soon as practicable after being notified of a need for leave (or the commencement of leave, if earlier). It is expected that in most circumstances there will be no desire that an employee be denied restoration after FMLA leave and, therefore, there would be no need to provide such notice. However, an employer who fails to provide such timely notice will lose its right to deny restoration even if substantial and grievous economic injury will result from reinstatement.

> (b) As soon as an employer makes a good faith determination, based on the facts available, that substantial and grievous economic injury to its operations will result if a key employee who has given notice of the need for FMLA leave or is using FMLA leave is reinstated, the employer shall notify the employee in writing of its determination, that it cannot deny FMLA leave, and that it intends to deny restoration to employment on completion of the FMLA leave. It is anticipated that an employer will ordinarily be able to give such notice prior to the employee starting leave. The employer must serve this notice either in person or by certified mail. This notice must explain the basis for the employer's finding that substantial and grievous economic injury will result, and, if leave has commenced, must provide the employee a reasonable time in which to return to work, taking into account the circumstances, such as the length of the leave and the urgency of the need for the employee to return.

32

29 C.F.R. §825.219.

## VI.  DISCUSSION

**A.  Is Plaintiff entitled to the FMLA's protections?**

**1.  Defendant's arguments**

To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1293 (11th Cir.2006).   The employer's motives are irrelevant.  *Id.* In arguing for summary judgment because Plaintiff is not entitled to the FMLA protections, Defendant first asserts Plaintiff did not suffer from a serious health condition as defined by the FMLA.   Second, Defendant argues Plaintiff failed to return to Texas on or before the expiration of her FMLA leave, resulting in her loss of FMLA protections.   Third, in this regard, Defendant asserts Plaintiff violated Texar's usual and customary notice and procedural requirements, depriving her of the protections of the FMLA.   The Court considers each argument in turn below.

**2.  Whether Plaintiff suffered a "serious health condition"**

A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves-(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."29 U.S.C.A. § 2611(11). It is undisputed Plaintiff did not receive inpatient care for her mental condition. Thus, if she suffered a serious health condition it is because she received "continuing treatment by a health care provider."

The FMLA does not define "continuing treatment by a health care provider," but the Department of Labor has issued a regulation defining that phrase, in relevant part, as follows:

(2) *Continuing Treatment* by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

> (I) *A period of incapacity* (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (A) Treatment two or more times by a health care provider, by a nurse or a physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
> >
> > (B) Treatment by a health care provider on at least one occasion which results in *a regimen of continuing treatment* under the supervision of the health care provider.

*Id.* (*citing* 29 C.F.R. § 825.114(a)(2)(i))(final emphasis supplied). "A regimen of continuing treatment," under subsection (a)(2)(i)(B), "includes, for example, a course of prescription medication." 29 C.F.R. § 825.114(b).

Here, it is undisputed that Plaintiff received treatment more than two times from health care providers for her mental condition, that she had a regimen of continuing treatment (prescription medication) under the supervision of her physicians, and that her condition continued over an extended period of time. Plaintiff's initial visit to Dr. Clevenger "result[ed] in a regimen of continuing treatment," § 825.114(a)(2)(i)(B), in that she was put on a new "course of prescription medication;" § 825.114(b), namely Lexipro, and was referred to Dr. Feir for treatment.

As set out by the evidence discussed above, at the end of March 2005, Plaintiff was depressed, stressed out, nervous, and upset. She had become this way because of what she believed

to be unjust criticism of her job performance by Lee and Stolee and because she felt Lee and Stolee had threatened to fire her.  When Dr. Clevenger saw Plaintiff on March 29, 2005, Dr. Clevenger stated Plaintiff was very depressed, very anxious, and could not sleep, all due to issues at work. Dr. Clevenger put Plaintiff on Lexipro, an antidepressant/anti-anxiety medication and referred Plaintiff to Dr. Betty Feir, a clinical psychologist, for treatment. Being of the opinion that Plaintiff needed some time off from work, Dr. Clevenger signed a medical excuse stating Plaintiff should not return to work until April 4, 2005. Later, when Dr. Clevenger's clinic submitted to Texar the FMLA approved Certificate of Heath Care Provider on Plaintiff, the Certificate stated Plaintiff's condition as "significant depression secondary to job stress" and the probably duration of Plaintiff's job incapacity to be "3/29/05 thru 4/29/05."

On April 4, 2005, Plaintiff saw Dr. Feir for the first time. Dr. Feir's assessment of Plaintiff was "significant depression secondary to job stress." Dr. Feir's diagnosis of Plaintiff was MDD, major depressive disorder. Subsequent to April 4, 2004, Plaintiff continued to see Dr. Feir on a weekly basis.

On April 5, 2005, Plaintiff wrote Stolee a letter requesting to be put on FMLA leave. On April 12, 2005, Stolee, on behalf of Texar, wrote Plaintiff granting her request for FMLA leave effective March 29, 2005.  Between April 4, 2005, and May 5, 2005, Plaintiff did not inform Texar when she would be returning to work; she asserts this is so because she did not know when this was going to be. Plaintiff did, however, provide weekly status reports on her condition to Texar either personally or through Dr. Feir.

On May 5, 2005, Dr. Feir released Plaintiff to return to work at Texar on May 12, 2005. Dr. Feir was of the opinion that Plaintiff could perhaps have returned to work on another job which was

free of stress in April of 2005 but that she was unable to return to work at Texar, with its attendant stress, until May 11, 2005, at the earliest.

There is evidence from which a jury could determine both Dr. Clevenger and Dr. Feir certified that Plaintiff had "significant depression secondary to job stress." There is case law indicating that stress, depression, and/or nervous breakdown can constitute a serious health condition for FMLA purposes. *See Collins v. NTN-Bower Corp.,* 272 F.3d 1006 (7th Cir.2001); *see also Spangler v. Federal Home Loan Bank of Des Moines,* 278 F.3d 847, 852 (8th Cir.2002).

Twenty-nine U.S.C. § 2612(a)(1)(D) provides that an employee is entitled to take FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  "It is not enough for [Plaintiff] to show merely that [s]he has a serious health condition; [s]he must prove that the serious health condition made [her] unable to work during the absences for which he claims he was entitled to FMLA leave." *Poteet v. Potter*, 2005 WL 1115805, *13 (S.D. Ind. 2005)(*citing* 29 U.S.C. § 2612(1)(D)).  *See also Haefling v. United Parcel Service, Inc.,* 169 F.3d 494, 499 (7th Cir. 1999)("The plaintiff must make a threshold demonstration that the illness or injury at issue resulted in an incapacity requiring absence from work or school <u>or</u> an absence from or an inability to perform daily activities for more than three calendar days. The plaintiff must then show that he received continuing treatment as a result of this incapacity.")(emphasis added); *Murray Red Kap Indus., Inc.,* 124 F.3d 695, 698 (5th Cir.1997)(indicating that plaintiff must show that her absence from work "was *necessary"* and affirming judgment as a matter of law where there was no evidence that employee was unable to work during absence)(emphasis in original).

36

Defendant argues Plaintiff was not incapacitated within the meaning of the FMLA because, among other things, Plaintiff engaged in normal daily activities while on leave.  Specifically, Defendant asserts neither the FMLA nor its regulations provides an automatic designation of a "serious health condition" where an employee on FMLA leave is capable of engaging in normal activities and working simply because the instructions to do so come from a psychologist.  Defendant emphasizes that as part of the treatment plan for Plaintiff's alleged stress, Dr. Feir told Plaintiff to find another job and do nice things for herself. (Feir Depo. pg. 120:8-19, and Ex. 3 [April 4, 2005 notes]).  Plaintiff took this advice and, during her leave, engaged in normal, everyday activities, including shopping, spending time with her children, driving them to and from school, and attending school and family functions.  (Plaintiff's Depo. pgs. 70:4-71:2; 95:9-15; 96:6-97:4; 97:16-22; 125:5-126:5; 127:19-128:10)(Feir Depo. pgs. 37:19-39:12).

Despite Defendant's focus on Plaintiff's off-work activities during her leave, the Court is not convinced Plaintiff must show an inability to perform daily activities if she is able to show she was unable to perform her work and her absence from work was necessary.  An incapacity requires absence from work as a necessity <u>or</u> an inability to perform daily activities. *See Haefling v. United Parcel Service, Inc.,* 169 F.3d 494, 499 (7th Cir. 1999)("The plaintiff must make a threshold demonstration that the illness or injury at issue resulted in an incapacity requiring absence from work or school <u>or</u> an absence from or an inability to perform daily activities for more than three calendar days. The plaintiff must then show that he received continuing treatment as a result of this incapacity.")(emphasis added); *Murray Red Kap Indus., Inc.,* 124 F.3d 695, 698 (5th Cir.1997)(indicating that plaintiff must show that her absence from work "was *necessary"* and affirming judgment as a matter of law where there was no evidence that employee was unable to

37

work during absence)(emphasis in original).   Here, Plaintiff has presented sufficient summary

judgment evidence to create a genuine issue of material fact on whether she was able to perform her

work at Texar.   Dr. Feir's recommendation that Plaintiff engage in family activities, and Plaintiff's

ability to engage in said activities, are not dispositive of Plaintiff's ability or inability to perform her

work at Texar because of the alleged stress she felt from her job there.

Defendant also takes issue with the fact that just days into her FMLA leave, Plaintiff applied

for a job with Bank of the Ozarks, and according to Dr. Feir, she could have taken the job had it been

offered:

Q: Well, was she able to –would she have been able to take another job— based on
your treatment of her as a healthcare provider, would she have been able to take
another job that did not have the stress she felt at Texar?

A: She might have been better able to function in a situation where she was not under
so much stress.

Q: Is it your testimony that Bank of the Ozarks was not even opened at the time she
submitted this application?

A: It is my understanding that at the time she submitted that I don't believe it was.
I believe they were working out of a small office in a building over here, but not that
it really matters. **The real question is did I think she should be applying for other
jobs if she thought she was about to be terminated, and I did feel that. And I
suggested to her as you have already asked me that she apply for some other
jobs**.

\* \* \*

Q: Do you think it would have been possible for her in April to go back to some other
type of job, let's say, if it weren't under her current supervisor?

A: I don't know. I don't know. **Probably.**

(Feir Depo. pp. 34:21-35:13; 59:2-5)(emphasis added).

However, Plaintiff has presented evidence that the Bank of the Ozarks was not open for business when Plaintiff submitted her application and any job she might obtain from her application was prospective in nature.  In addition, Dr. Feir opined Plaintiff could probably have gone back to work in April of 2005 but only on another job, with a different supervisor, and without the stress she was allegedly subjected to at Texas.

Most importantly, in this regard, there is authority indicating an inability to work in the plaintiff's *current job* due to a serious health condition is enough to show that the employee is incapacitated.  In *Snelling v. Stark Properties, Inc.*, 2006 WL 2078562, *12 (M.D. Ga. 2006), the court rejected an argument that because a plaintiff could have worked at some *other* job other than her current job she did not have an "inability to work," and noted that the Eighth Circuit court of appeals had recently rejected the same argument.  *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1295 (11th Cir.2006)("[W]e hold that a demonstration that an employee is unable to work in his or her *current job* due to a serious health condition is enough to show that the employee is incapacitated, even if that job is the only one the employee is unable to perform.").  Here, the Court finds there is evidence indicating Plaintiff's condition caused periods of incapacity at her current job, thus making her unable to perform the functions of her position.

Defendant relies upon two cases from the Eastern District of Texas, asserting the mere possibility that a person can work removes FMLA protection.  In *Cole v. Sisters of Charity of the Incarnate Word*, 79 F. Supp. 2d 668 (E.D. Tex. 1999), the plaintiff claimed she was denied leave to which she was entitled under the FMLA because she had a serious health condition.  The plaintiff

39

also claimed she suffered retaliation for attempting to exercise those rights.  *Id.* at 670.   In

considering the defendant's motion for summary judgment, the court noted Congress, in enacting

the FMLA, "did not intend to provide coverage for minor health conditions which would be covered

by an employer's sick leave policy."  *Id.* at 671.   The court then noted that the FMLA requires

incapacity, "that is, the inability to work or perform regular daily activities."  *Id.* (*citing Murray v.

Red Kap Industries, Inc.*, 124 F.3d 695 (5th Cir. 1997).[2]   The court stated that "[w]hile the plaintiff

in the present case suffered stress and ultimately a day of illness, there is no evidence that she was

unable to perform the functions of the job."  *Cole*, 79 F.Supp.2d at 672.

Unlike this case, the plaintiff in *Cole* testified in her deposition that "the condition she

suffered from never prevented her from performing regular life functions nor prevented her from

working."  *Id.*  The plaintiff in *Cole* also requested a transfer at one point, and in the request, she

acknowledged that she could continue working until her rotation was finished.  *Id.*  Another reason

the *Cole* case is distinguishable from this one is there the plaintiff's doctor advised the plaintiff to

---

[2] In *Murray*, the plaintiff sued the defendant for violating the FMLA by discharging her after she had missed eight days of work due to a respiratory tract infection.  124 F.3d at 696. After the plaintiff had presented her case in chief to the jury, the defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  *Id.*  The district court found the plaintiff had failed to produce sufficient proof that she suffered from a "serious health condition" during the second week of her illness and granted the defendant's motion.  *Id.*  The Fifth Circuit affirmed.  *Id.*  In attempting to establish incapacity, the plaintiff relied on her own testimony that her physician told her not to work as long as she was feeling weak.  *Id.* at 698. The Fifth Circuit stated the plaintiff's testimony did "little, if anything, to help show that her absence from work during the period from March 27 to March 29 was *necessary*."  *Id.* (emphasis in original).  Regarding the testimony of the plaintiff's physician that it would have been reasonable for the plaintiff to have taken one week off following her March 24 appointment, the Fifth Circuit found this evidence irrelevant "in light of the fact that . . . [the doctor] gave [the plaintiff] a work release stating that she 'is able to return to work . . . on 3/27/95. . . .'"  *Id.* at 698- 699.  Given the evidence in *Murray*, the Fifth Circuit concluded no rational jury would believe that the plaintiff was unable to work during the period from March 27 to March 29.  *Id.* at 699.

seek a transfer off of the project; the doctor never advised the plaintiff to quit her job.  *Id.*  The court

in *Cole* concluded:

> By her own admissions, Plaintiff was able to perform the functions of a respiratory
> therapist and there is no indication that her stress caused her any period of incapacity
> as it has been defined - even on the day before her termination.  While it is true that
> she fell ill and had to leave work, this is not evidence of the inability to work as
> required by the FMLA.  Thus, she does not meet the requirements for having a
> serious health condition and is not eligible for FMLA leave.

*Id.*

In *Fisher v. State Farm Mut. Auto. Ins. Co.*, 999 F. Supp. 866 (E.D. Tex. 1998), *aff'd* 176

F.3d 479 (5th Cir. 1999), the other Eastern District of Texas case relied upon by Defendant,  the

plaintiff had been an employee of State Farm Mutual Automobile Insurance Company ("State

Farm") since 1989.  When the plaintiff's father's health began to decline in June of 1994, the

plaintiff began to take time off of work to assist his father with his business and with his health

problems.  *Id.* at 867.  The plaintiff's father passed away on September 9, 1994.  During this time,

the plaintiff was absent sixteen days.  *Id.*  Subsequently, the plaintiff requested another leave of

absence for up to sixty days "with the right to return sooner if [his] personal conflicts and

responsibilities will allow."  *Id.*  The request indicated the plaintiff was the executor of his father's

estate; his mother had mental distress due to his father's death; and his father's death and the

plaintiff's additional responsibilities were causing difficulties in the plaintiff's marriage and on his

mental state.  *Id.*

After receiving the plaintiff's request, the plaintiff's supervisor advised the plaintiff that he

would need to have a doctor complete the State Farm Family Leave Certification Form to support

his request for leave.  *Id.* at 868.  The plaintiff then visited a doctor who diagnosed the plaintiff with

adjustment disorder; the doctor left blank the portion of the certification form asking whether the plaintiff was able to perform work of any kind or able to perform the functions of his position. *Id.* The doctor prescribed the plaintiff Zoloft, and State Farm approved two weeks leave for the plaintiff. *Id.*

According to the plaintiff's deposition testimony, the plaintiff "used these two weeks to engage in activities related to his position as executor of his father's estate, including running his father's business." *Id.* At the end of the two weeks, when the plaintiff did not return to work or request additional leave, State Farm terminated the plaintiff's employment. *Id.* The plaintiff brought suit against State Farm alleging, among other things, a cause of action under the FMLA. *Id.* at 867-868.

In granting State Farm's motion for summary judgment, the court first noted the Fifth Circuit requires a period of incapacity to establish a serious health condition for a patient receiving continuing treatment from a medical professional. *Id.* at 871. The court was persuaded by the defendant's evidence that demonstrated the plaintiff was not incapacitated. *Id.* Specifically, the defendant pointed to the plaintiff's testimony that during his two weeks of approved leave, he was active in discharging his duties as executor of his father's estate. *Id.* at 869. The defendant also pointed to the doctor's testimony that the plaintiff "could still perform the activities of daily living and that his stress could have been eliminated by finding another person to handle the probate of his father's estate." *Id.* The court held the plaintiff failed to show a fact question regarding any incapacity and thus granted the defendant's motion.

As with *Cole*, the Court finds *Fisher* distinguishable. Importantly, in *Fisher*, the defendant

presented testimony from both the plaintiff and the plaintiff's physician that the plaintiff's stress could have been eliminated by finding another person to handle the probate of his father's estate. *Fisher*, 999 F. Supp. at 869.  Unlike here, there was no evidence that the plaintiff was unable to work at his job because of the stress he allegedly suffered.   Here, Plaintiff has presented competent summary judgment evidence indicating two physicians diagnosed her with significant depression secondary to job stress and further recommended she take leave from her job at Texar.

Defendant further asserts Plaintiff's FMLA leave was a sham, relying on Dr. Feir's testimony that she asked Texar about Plaintiff's remaining FMLA time because she did not want to keep Plaintiff out of work past the expiration of the leave time.  (Feir Depo. pgs. 56:19-57:9)(A: "I wanted to make sure that I did not release Karen one day after her FMLA leave might have expired. . . ."). Defendant asserts this testimony indicates Plaintiff's alleged health condition was irrelevant; what dictated the amount of leave was the amount of Plaintiff's remaining FMLA leave.

However, viewing the evidence in the light most favorable to Plaintiff, Dr. Feir explained that if Plaintiff's leave was due to expire on May 11, 2005, Dr. Feir would have been willing to release Plaintiff to work on May 11, 2005, one day before the return-to-work release date of May 12, 2005 she eventually selected.  Further, even though Plaintiff told Dr. Clevenger on April 28, 2005 she wanted to stay off work longer, Dr. Clevenger testified in her deposition that she would not have recommended Plaintiff stay off work longer unless she thought it might help Plaintiff mentally.

In sum, the Court is not convinced by Defendant's arguments that Plaintiff was not incapacitated within the meaning of the FMLA as a matter of law.   Plaintiff has submitted enough evidence to withstand summary judgment on this point. Viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude as a matter of law that Plaintiff did not suffer a

"serious health condition" as that phrase is defined by the FMLA regulations.  It remains for the trier-of-fact to decide if Plaintiff suffered a serious health condition.

**3.      Whether Plaintiff failed to return to Texar on or before the expiration of her FMLA leave**

Defendant further asserts Plaintiff failed to return to Texar on or before the expiration of her FMLA leave, resulting in her loss of the FMLA's protections.  The FMLA does not protect an employee who fails to return to work on or before the date her FMLA leave expires. *Hunt v. Rapides Healthcare Sys.*, 277 F.3d 757, 763 (5th Cir. 2002); *Felder v. Winn-Dixie Louisiana, Inc*., No. 03-1438, 2003 U.S. DIST. LEXIS 22535, at *15 (E.D. La. Dec. 15, 2003)(if an employee fails to return to work on or before the date the FMLA leave expires, the right to reinstatement also expires).

Defendant asserts Plaintiff exhausted all available FMLA leave on June 10, 2006 and never returned to Texar.  Defendant relies on Plaintiff's testimony that she voluntarily left Texar to spend time with her children. (Plaintiff's Depo. pg. 133:15-21).  On the other hand, Plaintiff refers to Stolee's May 9, 2005 letter to Plaintiff wherein Stolee states:

> As previously stated in our earlier correspondence, we consider you to be a 'key employee.' Based upon this 'key employee' status, we have filled your position as of Friday May 6, 2005 at 8:30 am. We did not receive your letter with your intent to return to work until May 6, 2005 at 11:30 am. At this time we do not have a position available for you to return to.

(Meadows Ex. F-12).  According to Plaintiff, this letter informed her (1) as previously stated in Texar's correspondence to her, Texar considered her to be a "key employee;" (2) based upon this "key employee" status, Texar had filled her position as Operations Manager of Texar's main office in Texarkana with someone else as of Friday, May 6, 2005, at 8:30 a.m.; and (3) as of May 9, 2005,

there was no position at Texar to which she could return. This letter did not inform Plaintiff she was still employed by Texar or she was eligible to be placed by Texar in another position at Texar.

Plaintiff contends if she was a "key employee" of Texar, she would not be entitled at the conclusion of her FMLA leave to be restored to any job at Texar. 29 U.S.C. §2614(b)(1). This was part of Texar's FMLA policy, and according to Plaintiff, Stolee was aware of this policy as evidenced by Stolee's letter to Plaintiff dated April 12, 2005, wherein Stolee states:

> As a follow up to our discussion on April 7, 2005, when you notified us of your intent to take FMLA, we do consider you a 'key employee' as described in 825.218 of the FMLA regulations. Leaving your position unfilled for the duration of your absence could cause substantial and grievous economic harm to us. As such as can not guarantee reinstatement to your same or similar position.

(Meadows Ex. F-5).

Plaintiff states when she read the May 9, 2005, letter, she had no reason to believe anything other than she had been terminated.  For this reason, Plaintiff states she did not return to work at Texar on May 12, 2005 as she had been released to do by Dr. Feir.

On May 17, 2005, in the exercise of what Plaintiff contends was damage control, Stolee informed Plaintiff for the first time Plaintiff was still employed by Texar and was eligible to be placed by Texar in another position at Texar. Plaintiff asserts, however, on June 2, 2005, Texar's then defense counsel, Marshall Wood, advised Plaintiff's counsel by letter that Texar's position in the matter was that Meadows had been designated a key employee by Texar and was not guaranteed reinstatement by Texar "to the same or similar position."  (Meadows Ex. F-16).  In the letter, Mr. Wood said nothing about Stolee's letter to Plaintiff dated May 17, 2005, or the position Stolee took in the letter that Plaintiff was eligible to be employed by Texar in another position.  Plaintiff asserts

45

that as of the date Mr. Wood called Plaintiff's counsel during the week of May 23, 2005, Plaintiff and Plaintiff's counsel were obliged to deal exclusively with Mr. Wood in this case on behalf of Texar and were further obliged to accept Mr. Wood's characterization of Texar's position in this case in preference to Stolee's characterization of Texar's position.

On June 16, 2005, Stolee wrote Plaintiff a letter in which Stolee summarized her interpretation of what had happened in the case thus far and concluded by stating "we now consider you to have voluntarily resigned your position as an employee of Texar Federal Credit Union." (Meadows Ex. F-17). Stolee once again took the position that Plaintiff was a key employee and not subject to reinstatement in the employ of Texar at the end of her FMLA leave. Contrary to the position taken by Marshall Wood in his letter to Plaintiff's counsel dated June 2, 2005 (Meadows Ex. F-16), and contrary to the position Stolee herself took in her letter to Plaintiff dated April 12, 2005 (Meadows Ex. 5), Stolee stated, notwithstanding her classification of Plaintiff as a key employee, that Plaintiff was nevertheless entitled to be reinstated by Texar at least in a "similar" position. Stolee takes the position that as of June 16, 2005, Plaintiff had resigned her position as an employee of Texar but fails to specify from what position Plaintiff had resigned.

As of May 6, 2005, Plaintiff was no longer employed by Texar as Operations Manager of Texar's Texarkana main office. Plaintiff presents evidence indicating that as of May 20, 2005, there were no vacant Operations Manager positions available at Texar.  The Court, viewing the evidence in the light most favorable to Plaintiff, finds persuasive Plaintiff's assertion that because of the June 2, 2005 communication from Mr. Wood, Plaintiff continued to believe she had been terminated on May 6, 2005.

Defendant contends Plaintiff admitted she voluntarily left Texar to spend time with her children. As noted by Plaintiff, however, this contention is based on an answer given by Plaintiff to a question put to her by defense counsel in Plaintiff's deposition regarding things Plaintiff had written on a job application she made to Century Bank on October 3, 2005. In response to an application question why Plaintiff had left her previous employment, Plaintiff answered "wanting to work closer to home, spend time with boys for summer and now ready to return to the work force." Regarding such answer, defense counsel asked Plaintiff if this answer was a true statement. Plaintiff answered "yes," and Plaintiff now asserts she thought defense counsel was asking if it was true she had made such a statement in the application, not whether the statement itself was true. Plaintiff explains she answered the Century Bank application in that way because she was desperate for employment at the time comparable to the employment she had at Texar and was fearful she would have no chance of such employment if she revealed the true involuntary nature of her leaving Texar.

Given the conflicting evidence, the Court finds there is a genuine issue of material fact regarding whether Plaintiff failed to return to Texar on or before the expiration of her FMLA leave. Viewing the evidence in the light most favorable to Plaintiff, Stolee's letter of May 9, 2005 could be viewed as a termination of Plaintiff's employment by Texar.

**4.      Whether Plaintiff violated Texar's notice and procedural requirements for requesting leave**

Defendant further contends Plaintiff violated Texar's usual and customary notice and procedural requirements, depriving her of the protections of the FMLA.  "An employer may . . . require an employee to comply with the employer's usual and customary notice and procedural

47

requirements for requesting leave." 29 C.F.R. § 825.302(d).  The FMLA does not protect an

employee who violates her company's "usual and customary notice and procedural requirement"

regarding the duration of her leave. As such, an employee loses the protection of the FMLA if she

does not adhere to her employer's notification policies, including those regarding how long she will

be out on leave and when she will return. *Sherrouse v. Tyler Refrigeration Corp*., No. 3:03-CV-

1716-H, 2004 U.S. DIST. LEXIS 9090, *16-18 (N.D. Tex. May 20, 2004).

It is undisputed that Texar had a usual and customary procedural requirement for employees

to provide a periodic report every Friday regarding their status on leave, as set forth in its FMLA

policy and in its correspondence to Plaintiff.  Texar's Employee Policy Manual provides that

"[w]hile on FMLA leave, employees must contact their supervisor or the Personnel Administrator

on at least a weekly basis to provide status updates."  (Plaintiff's Depo. Ex. 2). Defendant asserts

Plaintiff admits she failed to report in every Friday as required by Texar's written policy and further

concedes she tried to substitute her psychologist's periodic report for her own. (Plaintiff's Depo. pgs.

101:22-102:25; 164:4-165:10).

The Court is not convinced Plaintiff failed to adhere to Defendant's policies, thus depriving

her of the protections of the FMLA as a matter of law, for the following reasons.  Stolee's April 6,

2005 letter to Plaintiff stated that all "concerns/needs" Plaintiff had must be communicated either

directly by Plaintiff or included in the FMLA application paperwork." (Plaintiff's Depo., Ex. 9).

Although Defendant relies on this letter in support of its argument, this portion of the April 6 letter

is addressing Plaintiff's communication of any concerns or needs she might have had, as opposed

to her status.  Moreover, the above statement implies any concerns or needs of Plaintiff could be

communication in paperwork.  Similarly, in the April 12, 2005 letter from Stolee in which Texar

48

granted Plaintiff's request for FMLA leave, Stolee stated as follows:

> While on leave, you will be required to furnish us with periodic reports every Friday, beginning on 4/15/05, of your status and intent to return to work. If the circumstances of your leave change and you are able to return to work earlier than the date indicated on your request for FMLA leave, you will be required to notify us at least two working days prior to the date you intend to report to work.

(Meadows Ex. F-5).

Pursuant to the above report requirement, Plaintiff provided Texar with written status reports on April 14, 2005, on April 21, 2005, on April 29, 2005, and on May 5, 2005. The last two of these reports were in the form of written reports prepared by Dr. Feir and faxed by Dr. Feir to Stolee on April 29, 2005, and May 5, 2005, respectively. Defendant claims the reports of April 29, 2005, and May 5, 2005 were insufficient because they were proxy reports.  Defendant's FMLA policy as set forth in Stolee's letter of April 12, 2005 does not prohibit proxy reports. Even if it did, the FMLA allows proxy reports in certain circumstances. See 29 C.F.R. §825.303(b)("The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ('fax') machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally.").

Additionally, 29 C.F.R. §825.309(a) requires that the employer's policy regarding periodic reports "must take into account all of the relevant facts and circumstances related to the individual employee's situation."  In Plaintiff's case, she was under the care of Dr. Feir on April 29, 2005, and on May 5, 2005.  Plaintiff asserts Dr. Feir was in a far better position to provide an authoritative and informative report on Plaintiff's status than Plaintiff herself.

Finally, on May 2, 2005, in a letter sent by Stolee to Plaintiff, Stolee acknowledged receiving Dr. Feir's report of April 29, 2005. Although Stolee complained Dr. Feir's report was not specific as to how much time Plaintiff still needed on her leave, Stolee made no complaint about the report coming from Dr. Feir rather than Plaintiff herself.

Defendant has not shown as a matter of law that Plaintiff failed to adhere to Defendant's policies, thus depriving her of the protections of the FMLA.  The Court has considered Defendant's arguments regarding whether Plaintiff is entitled to the FMLA protections and finds there is a fact issue as to whether Plaintiff is protected by the FMLA.  Accordingly, the Court recommends this portion of Defendant's motion be denied.  Defendant has also argued, in the event the Court finds there is a fact issue as to whether Plaintiff is protected by the FMLA, that it did not interfere with Plaintiff's rights under the FMLA as a matter of law.

**B.     Whether Texar interfered with Plaintiff's rights under the FMLA**

To prevail on her claim for interference with her FMLA rights, Plaintiff must establish: (1) she is an eligible employee under the FMLA; (2) the defendant is an employer subject to the requirements of the FMLA; (3) she was entitled to FMLA leave; (4) she gave notice to the defendant of her intention to take FMLA leave; and (5) the defendant denied her the benefits to which she was entitled under the FMLA. *Jordon v. Texas Dep't of Aging and Disabilities Servs*., No. 9:05cv161, 2006 U.S. DIST. LEXIS 43895, *15-16 (E.D. Tex. June 28, 2006). Defendant asserts it did not interfere with Plaintiff's rights under the FMLA as a matter of law.  Defendant asserts: (1) it gave Plaintiff adequate notice of her key employee status; (2) it did not terminate Plaintiff's employment on May 9, 2005 prior to her tentative release to return to work; and (3) it had a substantially

50

equivalent position available for Plaintiff as of the date of her tentative release, but Plaintiff never returned to work upon her tentative release.

Specifically, Defendant first asserts Plaintiff's contention that Texar interfered with her FMLA rights when it filled her position on May 6, 2005 fails because Texar repeatedly advised Plaintiff that she was a key employee whose position could and would be filled in her absence.(Plaintiff's Depo. Ex. 2, 7, 9 and 12). According to Defendant, any contention by Plaintiff that the key employee notice was somehow defective also fails because Plaintiff received all entitlements under the FMLA. *Richardson v. Monitronics, Int'l Inc.*, No. 3:02-CV-2338-N, 2004 U.S. DIST. LEXIS 26705, *11 (N.D. Tex. Jan. 27, 2004), *aff'd* 2004 U.S. APP. LEXIS 18995 (5th Cir. 2004)(if an employee has received her entitlements under the FMLA, she does not have an FMLA claim regardless of the quality of the notice of FMLA rights she received).

The FMLA provides that "[i]n order to deny restoration to a key employee, an employer must determine that the restoration of the employee to employment will cause 'substantial and grievous economic injury' to the operations of the employer, not whether the absence of the employee will cause such substantial and grievous injury." 29 C.F.R. §825.218(a).  Plaintiff points out that in her letters to Plaintiff dated April 6, April 12, and May 6, Stolee advised Plaintiff that Texar's alleged substantial and grievous economic injury resulted from Plaintiff's absence from work, the very determination 29 C.F.R. §825.218 prohibits. According to Plaintiff, Defendant never made the determination required by 29 C.F.R. §825.218(a) prior to Plaintiff's termination. Plaintiff states Stolee admitted Texar had not made the determination required by §825.218(a) in her e-mail to Marshall Wood dated May 10, 2004.

51

Even if Texar had made the determination required by 29 C.F.R. §825.218(a), Plaintiff maintains there is no evidence to support Defendant's claim that it would suffer any substantial and grievous economic injury.  Plaintiff states that prior to her termination in 2005, she had been absent from work at Texar before, including an FMLA leave she took from August 15, 2004, to August 30, 2004. Plaintiff asserts, on those occasions, Plaintiff would be replaced on a temporary basis by Randelle Snyder, the Texar employee Texar hired to permanently replace Plaintiff on May 6, 2005. According to Plaintiff, this temporary replacement of Plaintiff by Snyder created no problems for Texar, and Texar could have done this same thing with regard to Plaintiff's 2005 FMLA leave.

As pointed out by Plaintiff, 29 C.F.R. §825.218(b) contemplates temporary replacement by an employer as a means of avoiding substantial and grievous economic injury arising from permanent replacement of an employee on FMLA leave.  In addition, 29 C.F.R. §825.219(b) requires an employer to provide a key employee with written notice of "a reasonable time in which [the employee could] return to work" once the employer had made the determination that substantial and grievous economic injury to its operations will result if a key employee who has given notice of the need for FMLA leave or is using FMLA leave is reinstated. 29 C.F.R. §825.219(b). No such notice, written or oral, was provided to Plaintiff.

Defendant further contends it did not terminate Plaintiff's employment during her leave. Defendant states Plaintiff's allegation that she was terminated by the May 9, 2005 letter is supported by nothing more than her personal and subjective opinion. Defendant points out the letter stated that no position was available *at that time.*  Defendant further asserts there were no objective indicia of a termination: (1) she was not asked to turn in her keys, complete an exit survey or retrieve her belongings; (2) she was not sent a COBRA letter or her personal effects; (3) Texar did not terminate

her benefits. Defendant further asserts Plaintiff, as a manager, had terminated employees at Texar, and she was not asked to do any of the things she knew occurred during a termination.  (Plaintiff's Depo. pgs. 100:11-101:6; 101:13-21; 109:15-110:6)(Lee Depo. pgs. 109:15-110:6; 111:1-112:3; 112:24-113:18; 124:10-13).

On the other hand, Plaintiff asserts that during this period of time Stolee, in the exercise of damage control, was taking the position that Plaintiff had not been terminated on May 6, 2005 and was eligible for employment by Texar in other positions.  Plaintiff argues Texar delayed taking action on the things discussed above in order to avoid the appearance of Plaintiff having been terminated her employment during Plaintiff's FMLA leave.

The Court agrees with Plaintiff that all of the "objective indicia of a termination" mentioned by Texar were under its exclusive control to act upon or to not act upon.  The Court, having reviewed the evidence in the light most favorable to Plaintiff, finds a genuine issue of material fact as to whether Defendant terminate Plaintiff's employment during her FMLA leave.

Assuming Plaintiff was not terminated on May 6, 2005, Plaintiff was entitled to be returned to the same position she held when her leave commenced or to an equivalent position "[o]n [her] return from FMLA leave." 29 C.F.R. §825.214(a).  Defendant asserts, as a matter of law, it did not fail or refuse to reinstate Plaintiff to a substantially equivalent position upon her expected return to work on May 12, 2005; to the contrary, Texar had such a job ready and waiting for Plaintiff, but she never returned to work and subsequently exhausted her full 12 weeks of leave under the FMLA. According to Defendant, prior to the anticipated completion of Plaintiff's FMLA leave on May 12, 2005, Texar had a substantially equivalent position available for her to assume if she returned to

work, and Texar never denied Plaintiff the opportunity to assume this position had she shown up or

contacted Texar in any manner about the job.

Just two days after Texar filled Plaintiff's position, and one day before Plaintiff's "tentative"

release to return to work on May 12, 2005, Texar opened the Centre West position.  According to

Defendant, this position was virtually identical to Plaintiff's prior Operations Manager position in

terms of title, benefits, hours, prestige, duties and responsibilities, and status in Texar's organization.

Lee, the second highest executive at Texar, confirmed the same:

> Q. Would she have been [in the Centre West position] equal to an Operations
> Manager on the organizational chart as it existed at that time?
>
> A. Yes.
>
> Q. So she wouldn't be considered by the credit union as having some sort of lesser
> position if she took that job?
>
> A. No.

(Lee Depo. pgs. 116:25-117:7).  Defendant states it was indisputably ready to offer Plaintiff her same

salary and benefits. Defendant further states the only difference between the jobs was the number

of employees directly supervised, which were approximately 17 at her prior position and 9 for the

Centre West job. Defendant maintains this difference, which would not affect Plaintiff's opportunity

for future advancement, pay, or any other material benefit, was nothing more than de minimis.  (Lee

Decl. ¶ 9).  Defendant contends any interference with Plaintiff's right to reinstatement was a direct

product of her failure to return to work on May 12 as she represented she would; Plaintiff admittedly

never bothered to contact Texar about this or any other job after May 9, 2005.  (Plaintiff's Depo. pgs.

110:7-111:8, 18-25).

An equivalent position is one that is nearly identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perks and status, and must involve the same or substantially similar duties and responsibilities that require substantially equivalent skill, effort, responsibility and authority. 29 C.F.R. § 825.215(a). De minimis, intangible changes in the employee's position do not violate the FMLA. 29 C.F.R. § 825.215(f). Courts interpreting the de minimis standard have found that both the loss or addition of minor responsibilities do not violate the FMLA. *See, e.g.*, *Smith v. East Baton Rouge Parish Sch. Bd.*, 453 F.3d 650, 652 (5th Cir. 2006)(lack of travel in employee's new position, versus required travel in prior position, was de minimis); *Oby v. Baton Rouge Marriott*, 329 F. Supp. 2d 772, 781-82 (M.D. La. 2004)(no FMLA interference claim where employer did not offer employee identical position, but prior and new positions both involved supervisory duties, and same goals and responsibilities); *Mitchell v. Dutchmen Mfr, Inc.*, 389 F.3d 746, 749 (7th Cir. 2004)(court found new position substantially equivalent to prior position despite addition of new job duties and new tools).

Plaintiff was released by Dr. Feir to return to work from FMLA leave on May 12, 2005. Plaintiff asserts between the time she received Stolee's letter of May 9, 2005, and May 12, 2005, she neither heard anything from nor was offered any employment by Texar. In Stolee's May 17, 2005 letter, Stolee mentioned Defendant must hear from Plaintiff immediately regarding Plaintiff's intent to return to work, but Stolee did not offer Plaintiff any particular job in her letter of May 17, 2005, and she did not state that any job which might be offered to Meadows would be equivalent to Plaintiff's old job.  Plaintiff states she did not receive Stolee's May 17, 2005 letter until May 19, 2005, and the Centre West/Call Center job was filled by someone else on May 20, 2005.

Regarding Defendant's assertion that the Centre West job was substantially equivalent to her

previous job, Plaintiff asserts the Centre West Operations Manager job involved the supervision of only nine employees whereas at her former job, Plaintiff supervised between 29 and 33 employees. Thus, according to Plaintiff, the vacant Operations Manager job was clearly not the equivalent of Plaintiff's former job in terms of job duties and responsibilities.

Plaintiff also disputes Defendant's assertion that it was ready to offer her the same salary and benefits on this new job. Plaintiff points out that shortly before she commenced her FMLA leave in March of 2005, she was under severe criticism about her job performance and had been threatened with firing. Plaintiff finds it hard to believe that notwithstanding the negative situation in March of 2005, Texar would assert it was nevertheless willing to pay Meadows her former position salary, $54,075.63, to perform a job with only a third of the responsibility of Plaintiff's former position only some 45 days later.

In light of all of the conflicting evidence, the Court finds genuine issues of material fact regarding Plaintiff's interference claim under the FMLA.  The Court recommends this portion of Defendant's motion be denied.   Defendant has also argued, in the event the Court determines that Plaintiff was protected by the FMLA and that Texar interfered with her rights thereunder, that Plaintiff is not entitled to recover back or front pay damages because she failed, as a matter of law, to mitigate her damages.

**C.     Whether Plaintiff failed to mitigate damages as a matter of law**

A plaintiff suing for back and/or front pay has a duty to mitigate her damages, and she must use reasonable diligence to obtain substantially equivalent employment. *West v. Nabors Drilling USA*, Inc., 330 F.3d 379, 393 (5th Cir. 2003) (requiring mitigation of back pay); *Carpenter v. Tyler*

*Indep. Sch. Dist.*, 429 F. Supp. 2d 848, 852 (E.D. Tex. 2006)(requiring mitigation of front pay). "Substantially equivalent employment" is employment which offers virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). The plaintiff must exercise reasonable diligence in both seeking and maintaining substantially equivalent employment in order to meet the reasonable diligence requirement. *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 936 (5th Cir. 1996).

The burden is on the employer to prove failure to mitigate. *Sellers*, 902 F.2d at 1193.  To meet this burden, the employer must demonstrate that substantially equivalent work was available to claimant and that the claimant did not exercise reasonable diligence to obtain it. *Id.* The reasonableness of a claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market. *Id.*  An employer can avoid the necessity of demonstrating that substantially equivalent work was available to claimant only by demonstrating that the claimant has not made reasonable efforts to obtain work. *Id.*

Once the employer proves that the employee has not made reasonable efforts to obtain work, the employer does not have to establish the availability of substantially equivalent employment. *West*, 330 F.3d at 393. A court may find failure to mitigate as a matter of law. *See, e.g., Palagi v. Nationwide Mut. Ins. Co.*, 69 F. Supp. 2d 903, 907 (S.D. Tex. 1999)(court held summary judgment evidence proved Plaintiff failed to use reasonable diligence as a matter of law).

Defendant has offered no evidence to demonstrate that substantially equivalent work was available to Plaintiff. Defendant will fail in its burden of proof on mitigation unless it has shown Plaintiff has not made reasonable efforts to obtain work.

Defendant first asserts Plaintiff spent nearly as much time searching for employment during her FMLA leave as she did following her voluntary resignation, noting Plaintiff's on-line application for employment with Bank of the Ozarks just eight days into her FMLA leave.   However, according to Defendant, in the eleven-month span between June 17, 2005, the date of her separation from employment with Texar, and May 10, 2006, the date of her deposition, Plaintiff had only applied for two jobs, neither of which was in the banking field.   Specifically, Plaintiff submitted two job applications – one with Ashley Furniture store as a Sales Representative for a commission only job, and one with Pilgrim's Pride in human resources.(Plaintiff's Depo. pgs. 119:9-25; 21:22-23:1)(Feir Depo. Ex. 3 [April 11, 2005 notes]). At the time of her deposition, Plaintiff was substitute teaching at short intervals and had decided to go back to school full time to earn her teaching certificate so she could spend more time with her children in the afternoons. (Plaintiff's Depo pgs. 17:19-18:20; 20:21-21:21; 23:11-23; 129:14-19). Defendant further relies on the following testimony from Plaintiff:

Q: How much time do you spend job searching?

A. Not a lot.

(Plaintiff's Depo. pg. 115:14-15).

Defendant maintains Plaintiff's testimony highlights the lack of reasonableness in her job search efforts: (1) she does not receive a weekly or Sunday paper, and she may read the Sunday paper "once or twice a month;" (2) she has internet access but never checked for jobs; (3) she has never registered on any internet job sites; (4) she has not joined any networking groups; (5) she has not applied for work at the local Texas Workforce Commission; and (6) she has not engaged in any

informal networking, such as telling friends that she is searching for a job. (Plaintiff's Depo. pgs. 23:7-10; 97:12-15; 115:17-116:14). Defendant asserts, at numerous points in time following her separation from employment, Plaintiff simply stopped looking for work because she wanted to spend time with her children, because she did not want to look for work, because of the holidays, because she wanted to try going back to school full-time, and because she believed no one would hire her with her lawsuit pending.  (Feir Depo. pgs. 63:20-25; 65:15-22; 69:14-70:5; 79:1-80:3; 86:2-11; 87:21-88:1; 99:18-23; 99:24-100:8; 102:15-23; 120:23-121:14, and Ex. 3 and 7 [Feir's notes from May 31, 2005, June 29, 2005, August 4, 2005, October 27, 2005, November 10, 2005, November 30, 2005, December 7, 2005, March 7, 2006, March 24, 2006, April 14, 2006, June 2, 2006, June 15, 2006, June 22, 2006, August 23, 2006, and September 8, 2006])(Plaintiff's Depo. pg. 133:9-19, and Ex. 23).

In response to this portion of Defendant's motion, Plaintiff asserts, since her termination on May 6, 2005, she has applied for employment at the following places: Century Bank, Texarkana, Texas; City of Texarkana, Texas; Ashley Furniture Homestore, Texarkana, Texas; Sims Independent School District, Sims, Texas; New Boston Independent School District, New Boston, Texas; and Pilgrims Pride, Pittsburg, Texas. On April 6, 2005, fearing she was about to be terminated in the employ of Texar, she applied for employment with Bank of the Ozarks, Texarkana, Texas. Plaintiff states that apart from some employment on a day-to-day basis as a substitute teacher with the Sims and New Boston School Districts, she was offered no employment at any of the above places. Plaintiff further asserts out of all of the above job applications, she was able to obtain only two job interviews, Bank of the Ozarks and Ashley Furniture Homestore.

Plaintiff further states that in May of 2006, she started taking night classes at Texas A&M-

Texarkana in order to obtain a teacher's certificate. After three weeks, she changed her mind about becoming a teacher and ceased taking these night classes. According to Plaintiff, had she been working during this time these night classes would not have interfered with her work. (Meadows Ex. A).

As pointed out by Plaintiff, consistent with her obligation to seek substantially equivalent employment, Plaintiff felt obliged to seek employment as a mid to high level management person preferably in a financial institution which pays in the $50,000.00 per annum range and is located in the Texarkana area.  Plaintiff has not been obliged to seek hourly pay, low level non-management employment. These restrictions limit Plaintiff's job possibilities in the Texarkana area, particularly when you consider Plaintiff's allegations in this lawsuit that she was involuntarily terminated in her last employment with Texar. In addition, Plaintiff states that after the subject lawsuit was filed, every time she would submit a job application to a prospective employer, defense counsel would subpoena such application from the prospective employer.

As reflected in Dr. Feir's reports, there were particular days when Plaintiff did not feel like looking for work. For example, when Plaintiff received Stolee's May 9, 2005, letter, Plaintiff was set back in her efforts to recover from her depression. (Meadows Ex. K, pg. 63) However, Dr. Feir states Plaintiff was looking for work throughout the entire period.  Dr. Feir knows this because she discussed Plaintiff's job search efforts with her. (Meadows Ex. K, pg. 64). Plaintiff also informed Dr. Feir she did not sign up for unemployment benefits because she wanted to go back to work. (Meadows Ex. K, pg. 65)

The Court, having viewed the evidence in the light most favorable to Plaintiff, finds a

genuine issue of material fact regarding whether Plaintiff made reasonable efforts to obtain work or whether Plaintiff has failed to mitigate as a matter of law.  The Court recommends this portion of Defendant's motion be denied.

Based on the foregoing, it is

**RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry # 30) be **DENIED**.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.  28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir.1988).

**SIGNED this 22nd day of January, 2007.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE